169 N.J. Super. 243 (1979)
404 A.2d 1164
IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE LICENSE OF ALEXANDER SILBERMAN, D.P.M., TO PRACTICE PODIATRY IN THE STATE OF NEW JERSEY.
Superior Court of New Jersey, Appellate Division.
Argued May 8, 1979.
Supplemental Argument June 5, 1979.
Decided June 18, 1979.
*245 Before Judges LYNCH, CRANE and HORN.
Mr. Bernard Rudd argued the cause for appellant Alexander Silberman, D.P.M.
*246 Ms. Joan D. Gelber, Deputy Attorney General, argued the cause for respondent State Board of Medical Examiners (Mr. John J. Degnan, Attorney General, attorney; Ms. Erminie L. Conley, Assistant Attorney General, of counsel).
The opinion of the court was delivered by HORN, J.A.D.
Appellant Alexander Silberman, Doctor of Podiatry, appeals from a final order and decision of the Division of Consumer Affairs, Board of Medical Examiners (Board), which is dated December 9, 1978 and which revoked appellant's license to practice podiatry and, pursuant to N.J.S.A. 45:5-11, assessed a penalty of $3,600 plus investigatory costs of $1,025.[1]
The foregoing final order and decision were the culmination of a proceeding initiated by the Attorney General by his complaint (twice supplemented) which charged appellant with "unprofessional, dishonorable or unethical conduct in the practice of podiatry," in violation of N.J.S.A. 45:5-8. The complaint specifically alleged that appellant charged Blue Cross-Blue Shield and Medicaid patients for more expensive podiatric services than he actually rendered, and that he subjected patients to unnecessary X-ray exposure merely for the purpose of claiming payment from insurance companies.
Thereafter hearings were held before a hearing examiner, who recommended that "a judgment of not guilty be entered" as to all the charges against defendant. The Board, however, rejected the examiner's recommendation, made independent findings of fact and entered the final order and decision as stated. Appellant's motion for a stay of the decision of the Board was denied by the Board but granted by us, with a direction that appellant file a bond or cash deposit in the sum of $5,000, to secure payment of the penalty and costs. We *247 also accelerated the hearing of the matter. Appellant thereafter complied with the direction of this court by depositing $5,000 in a savings account to be paid to the State in the event of affirmance.
Appellant's argument fundamentally projects a two-prong attack upon the Board's findings and determination: first, that the evidence adduced at the hearings did not support the findings, and second, that it was not legally proper for the Board to overrule the hearing examiner's findings and thereby substitute its own. We disagree with both of these contentions.

I.
Appellant came under investigation by Blue Shield and the New Jersey Department of Human Services, Division of Medical Assistance and Health Services, because a computer analysis showed he instituted an unusually large number of claims for radical excisions of toenails. Following his suspension effective January 21, 1975 from the State's Medicaid program, appellant requested a hearing, which was held late in 1975 before a hearing officer for the Division. The hearing officer concluded that the evidence before him did not warrant continuation of the suspension and recommended that the suspension of appellant be terminated.
However, on April 4, 1977 the Director of the New Jersey Division of Medical Assistance and Health Service reversed the hearing officer's decision. The Director found that the State had met its burden of proving by a preponderance of the believable evidence that appellant did in fact submit claims and received payment from Medicaid for more expensive podiatric services than were rendered. The Director ordered that appellant's original two-year suspension be affirmed, but that due to the length of the suspension appellant had already served he could immediately apply for reinstatement to the Medicaid program. This order was not appealed.
*248 On February 9, 1978 the Attorney General filed the instant complaint, which in addition to referring to the earlier proceedings resulting in appellant's suspension as a Medicaid provider asserted that appellant submitted claims for radical excisions and hammertoe corrections that were not performed, and that any medical services appellant rendered were of a noncompensable palliative nature, such as clipping of toenails or care of corns and calluses. The complaint also charged appellant with subjecting his patients to unnecessary X-ray exposure.
The State demanded that the Board suspend or revoke appellant's license to practice podiatry, pursuant to the Board's powers as stated in N.J.S.A. 45:5-8. The State also demanded the imposition of penalties for each listed offense, as well as costs.
Of central importance at the succeeding hearing before the hearing examiner was whether the medical services which appellant supplied to his patients were of a kind which would permit him to charge Blue Shield and Medicaid for radical nail excisions and for hammertoe capsulotomies. According to Barry Veltman, a senior utilization analyst for Blue Shield of New Jersey (whose computer analysis of submitted claims prompted the original investigation of appellant), in 1976 under Blue Shield's most basic contract a doctor was paid $37 for a radical nail excision and $16 for a nonradical excision. Blue Shield's description for appellant's disputed claims is:
Radical excision of nail, partial or complete, including destruction of nail matrix, with or without removal of subungual exostosis (permanent surgical removal of chronic ingrown or deformed nail).
A nonradical excision (which does not include removal of the nail matrix) is described by Blue Shield as follows:
Excision of nail, partial or complete, including nail bed or nail fold, with or without excision of subungual exostosis (e.g., for fungus infection of chronic paronychia).
*249 The matrix consists of the cells which comprise the nail root and allow it to regrow. Destruction of the matrix usually prevents or in some cases merely impedes growth of the nail.
We need not iterate in detail the podiatric opinions expressed by the experts during the hearing, namely, Drs. Greenfield and Nieuwenhuis for the State, and appellant and his expert, Dr. Roven. It would appear from the testimony of each that there are several methods of treatment of ingrown toenails. The issue was not so much the method, but whether what was done by appellant was in fact radical surgery for which the charges were made. One method of performing a radical excision involves cutting through a layer of skin, removing the matrix (nail root) and then closing the wound with sutures and bandaging. There would be some degree of bleeding and ordinarily there would be scarring. Another method consists of the use of a powerful caustic acid (phenol) to destroy the matrix and nail bed, and the cleansing of the area or the washing of the area with isopropyl alcohol following the use of phenol. According to Dr. Nieuwenhuis, no scar is generally left when he uses the phenol alcohol technique, because it is not a skin-cutting procedure. The method espoused by appellant and by Dr. Roven, and which appellant testified that he performed, was the phenol-bur process. This type was described as inducting anesthesia into the toe with adrenaline or epinephrine to control bleeding. A nail splitter is used to remove the offending section, which can be as small as 1/16 of an inch. The entire section is removed, right down to the root. A hemostat or similar instrument is used to remove the offending nail section and a surgical bur (similar to that used by dentists) is used to destroy the matrix. Phenol is used as a supplement to make sure the growth center is destroyed. Then light dressing is put on. Sometimes the patients are seen subsequently, but sometimes it is not necessary. The expert witnesses differed in their opinions as to the necessity for follow-up care.
*250 A hammertoe is basically a bent toe, occasioned by contraction of the inferior (bottom-foot) tendons of the foot and lengthening of the superior tendons, and the deformity of the bone itself as a result of this pulling. According to Dr. Greenfield, in the performance of a capsulotomy the surgical site may be approached from the top or the underside of the toe. An incision is made into the capsule of a toe joint to allow a bent toe to straighten out; blood will necessarily appear and generally a small scar will remain. A true hammertoe cannot be corrected by merely taping the bent toe to its neighbor.
According to appellant, in performing a capsulotomy he uses a block anesthesia and a very thin blade to cut the capsule. The next toe is used as a splint, and gauzetex is used to keep the toes together. Gentian violet is applied on the operated area, then wet dressing, and the patient is told to call if any problems develop. It is probable that the condition would recur, and then the doctor does the "very mild operation" over again.
As to the allegedly excessive number of X-rays, Dr. Nieuwenhuis said there is no need to take X-rays of the ankles when the pathology is hammertoe or ingrown toenail or exotosis, nor when the patient suffers diabetes or arthritis. The hearing examiner summarized the testimony of appellant's patients in the following manner:
* * * These witnesses did not know the meaning of radical excision with removal of the matrix, nor of capsulotomy. They testified that Dr. Silberman treated ingrown toenails and did some cutting, used a bur in some cases, gave some injections, and applied some medications. Although the toenails grew back, and in some of the cases the treatment was repeated, all of the patients who testified obtained relief from Dr. Silberman's treatment. None of them had any complaint and several were quite grateful to him. They did not say in so many words that he performed the operations for which he charged, but their description of what he did do is generally consistent therewith. None of them said he had not removed the nail matrix or failed to stab the toes to relieve the hammertoes.
*251 By way of contrast, on review of the transcript the Board of Medical Examiners found that
* * * [E]ach patient testifying orally or in writing claimed no problems which would warrant phenol-bur surgery, described no office procedure which would include the elements of phenol-bur surgery, and described not one element of the post-operative podiatric care essential to this form of surgery.
The Board found significant the fact that although the patients came to appellant with "corns and bunions and calluses," and were not in any other discomfort, appellant "had requested them to come back at intervals even though there was nothing bothering them." Those patients who testified to some removal of part of the nail were emphatic that all such portions of the nail had grown back. The patients also testified that he had never cut them with any type of knife nor drawn blood nor applied sutures, nor told them to soak a toe, elevate a foot, or wear cut-out or other type shoes.
The examiner said that the doctors the State produced "gave the impression of competence and complete honesty." However, the examiner said he could not "base a conviction upon their guesses." The examiner continued:
* * * They [the doctors] did not have sufficient factual information upon which to base a firm opinion. Dr. Nieuwenhuis did not examine any of the patients. Dr. Greenfield did not examine the patients until 1977 or 1978. Both men agreed that it would be very difficult if not impossible to tell by an examination so long after the event whether or not a partial radical excision had been done by the phenol-bur method.
Dr. Greenfield did say that a capsulotomy would leave a scar for many years and there were no such scars on the patients he examined. But this testimony was an after-thought given in such a manner that a decision could not be based on it.
As to the charge that appellant took too many X-rays, the examiner found that the "State offered nothing but opinions that under some circumstances they might not have *252 been necessary. There is, at most, a difference of professional opinion. There is no proof of malpractice."
The examiner found that there was "no evidence of wrongdoing and the circumstantial evidence does not amount to a preponderance. The proof does not warrant disciplinary action." He concluded:
It is clear that Dr. Silberman has rendered useful and needed podiatric services and should be allowed to continue to do so, hereafter carefully avoiding any basis for suspicion of wrongdoing.
He recommended that a judgment of not guilty be entered in the cases not covered at the previous Medicaid disciplinary hearing. He found appellant collaterally estopped to deny the charges of which he was previously found guilty, and said that appellant had been fully punished by his suspension as a Medicaid provider and that no further penalty was warranted.
The Board took a completely different view of the import of the evidence presented at the hearing. The Board found that the testimony of defendant's patients was entirely credible. That testimony "reveals services performed in removing corns and callouses and other soothing or palliative services but does not present the remotest suggestion of the actual performance of a radical excision or a hammertoe capsulotomy."
The Board accepted the testimony of Drs. Greenfield and Nieuwenhuis but found defendant's and Dr. Roven's testimony "not credible." The Board also found significance in the fact that appellant's records had the date of patient visit clearly and properly marked in ink, but that the descriptions of services rendered were marked in barely legible pencil, and that appellant had made additions to the cards of some of the patients long after the event. Appellant explained that his receptionist put the date of the patient visit in (in pen) and that he put the treatment in (in pencil). In addition, the Board expressed dissatisfaction that appellant's patient cards did not have a "clear designation of *253 complaint, diagnosis, treatment prescribed and/or performed, or follow-up, nor does he have X-ray films customarily taken before and after surgical procedures." The Board found appellant's records to be "patently inadequate and do not support performance by respondent of the procedures for which he billed."
The Board concluded that the proofs presented by the State furnished a reasonable factual basis for finding that appellant committed dishonest, unprofessional and unethical acts in violation of N.J.S.A. 45:5-8, and that each allegation was proven by a preponderance of the credible evidence. The hearing examiner, the Board argued, had in effect erroneously applied what amounted to a criminal standard of proof in this case.
Several observations should now be noted. Appellant conceded that the State was required to establish the truth of the charges against him only by a preponderance of the evidence.[2] The State's action here was not posited upon malpractice *254 on the part of appellant in failing to properly treat his patients or in injuring them as the result of neglect, lack of skill or other cause. The root of the charges was "unprofessional, dishonorable or unethical conduct" in gouging patients or those agencies which were billed for the services by (1) charging for services which were not performed and (2) performing services which were neither requested, required nor called for. Hence, although appellant strenuously argues that his method of performing the radical surgeries was a more humane and less distressing process, that is not the point and it was not the basis of the Board's determination. The Board in effect found from the evidence that appellant had failed to perform even the radical surgery of the type which appellant endorsed and espoused. These findings were based on the testimony and affidavits of patients as well as appellant's own admissions that at no time were the patients who allegedly were the beneficiaries of the surgery compelled to return or told to return for follow-up care. Additionally, it found that the lack of any indication of a capsulotomy in the cases of hammertoes, the frequent returns of the patients for repeat attention for the same cause and the unrequired number of X-rays in their totality demonstrated the truth of the charges.
Our review satisfies us that under the applicable law the Board's findings are supported by substantial credible evidence. Appellant's argument to the contrary under this point actually goes only to the weight of the evidence, not that there is not sufficient evidence. Because we are satisfied from our careful review that the Board's factfindings were supported by "sufficient or substantial credible evidence in the record," we affirm. In re Heller's Suspension, 73 N.J. 292, 309 (1977); Mayflower Securities v. Bureau of Securities, 64 N.J. 85 (1973); Close v. Kordulak Bros., 44 N.J. 589 (1965). In our view said findings are well articulated and tied to the evidence produced below.

*255 II
The hearing examiner was a retired judge of the New Jersey Superior Court with much experience as a factfinder. Because he recommended that the charges be dismissed on the basis that "there is no direct evidence of wrongdoing and the circumstantial evidence does not amount to a preponderance," appellant contends that "[t]he reported cases * * * do not permit an arbitrary or capricious overthrow of the Hearing Officer's findings." But even being aware of the observation of Judge (now Justice) Handler in General Motors Corp. v. Blair, 129 N.J. Super. 412, 421 (App. Div. 1974), that when prosecutorial and adjudicative functions are concentrated in the same body and exercised in a quasi judicial setting there is increased danger that resultant dispositions may be arbitrary, we are of the belief that the Board was empowered and even justified in rejecting the hearing examiner's recommendation.
If we were reviewing the findings of the retired judge, as such, in a judicial setting, we would be bound to uphold same. Mayflower Securities v. Bureau of Securities and Close v. Kordulak Bros., both supra. However, we are not reviewing the examiner's findings in such a setting  we are reviewing the findings of the Board. N.J.S.A. 52:14B-12. Therefore, as already stated, we must affirm if its findings are supported by substantial credible evidence.
The rules which govern the procedures of the Board are stated in N.J.S.A. 52:14B-10. Thus, in the case at bar the president of the Board (head of the agency) "shall adopt, reject or modify the recommended report and decision." N.J.S.A. 52:14B-10(c). The hearing examiner's report and recommendations, including his findings, are not exhausted or otherwise dismissed if rejected by the administrative body to whom the report is transmitted. We are entitled to review those findings and recommendations in our overview of the record, for the purpose of determining whether or not the Board's findings are supported by substantial *256 credible evidence. Although we are not referred to any case in this State which expressly enunciated this rule, it appears to be a reasonable one and is that which is followed by our federal courts. See 2 Davis, Administrative Law Treatise, § 10.04 at 18 (1958), supplemented 1970 Supp. at 410 and 1976 Supp. at 314. See New Jersey Bell Tel. Co. v. State, 162 N.J. Super. 60 (App. Div. 1978).
While the Board, sitting in a quasi-judicial capacity, "cannot be silent witnesses as well as judges," N.J. State Bd. of Optometrists v. Nemitz, 21 N.J. Super. 18, 28 (App. Div. 1952), an agency's "experience, technical competence, and specialized knowledge may be utilized in the valuation of the evidence." N.J.S.A. 52:14B-10(b); Mayflower Securities v. Bureau of Securities, supra, 64 N.J. at 93; New Jersey Bell Tel. Co. v. State, supra. Here the Board evaluated the evidence in the light of its expertise  an expertise not possessed by the hearing examiner. It carefully and sensibly considered the examiner's findings, statements and report, and demonstrated appropriate grounds for refusing to accept them in areas which affected the result. In this light, and finding as we do that the evidence with its reasonable inferences supports the Board's findings, we are enjoined to uphold the final order and decision except as stated hereinafter.

III
Appellant did not raise the issue of the authority of the Board to impose the penalty of $3,600 and the costs of $1,025. Since we had some doubt as to the existence of such authority and the matter had not been briefed, we requested supplemental briefs and additional oral argument on the point. We have now concluded that the Board was vested with the requisite authority to impose said penalty by virtue of N.J.S.A. 45:5-11. At first blush this statute might appear to require that penalties be imposed and collected in the county district or municipal courts pursuant *257 to N.J.S.A. 45:5-11(b). But a close reading of this entire section, 11(a) and (b), renders it clear to us that this is not so. Although county district and municipal courts are vested by that statute with the jurisdiction to "hear and determine actions for penalties," we are satisfied that this means such penalties as have already been imposed by the Board by virtue of its authority under N.J.S.A. 45:5-11(a).
As a practical matter, if the Board did not have the requisite authority to impose the penalties, it would require a duplication of hearings  first, before the Board and second, for the penalty in one of the mentioned courts. In Mayflower Securities v. Bureau of Securities, supra, in dealing with a statute (N.J.S.A. 49:3-70) similar in pertinent language to N.J.S.A. 45:5-11, the court observed that the monetary penalty was "presumably administratively assessed."
In re Heller's Suspension, supra, appears to assume as a matter of course that the New Jersey State Board of Pharmacy was so vested with the authority to impose such penalties under N.J.S.A. 45:14-37 and 38, which statutes are similar in content to the one with which we are presently concerned, N.J.S.A. 45:5-11. Contrary to the situation with which the court in Heller was confronted, in the instant case the complaint furnished express notice to appellant that a monetary penalty was being sought. In any event, any lingering doubts of the Board's authority are completely dispelled by Malady v. Board of Review, 76 N.J. 527 (1978), and the opinion of the Appellate Division in the same case following the Superior Court's remand, 166 N.J. Super. 523 (App. Div. 1979), and In re Wolfe Suspension of License, 160 N.J. Super. 114 (App. Div. 1978).
We consider O'Doud's Dairy v. Hoffman, 52 N.J. Super. 135 (App. Div. 1958), if to the contrary, to have been at least impliedly overruled by the subsequent cases which we have mentioned on this point. Cf. Kugler v. Romain, 110 N.J. Super. 470, 486-487 (App. Div. 1970), mod. on other grds. 58 N.J. 522 (1971).
*258 We also note the enactment of the Uniform Enforcement Act, L. 1978, c. 73, N.J.S.A. 45:1-14 et seq., applicable to virtually all professional boards, which specifically provides for the assessment of civil penalties by the boards against licensed persons, N.J.S.A. 45:1-22. As noted in Heller, supra, 73 N.J. at 308, when a statutory amendment is enacted soon after controversies arise as to the interpretation of the original act, "it is logical to regard the amendment as a legislative interpretation of the original act * * *." The Uniform Enforcement Act was enacted soon after Heller and Wolfe, both supra, were decided. In sum, we find that the Board was legally permitted to impose said penalty in the sum of $3,600.
However, we do not find that such authority existed as to the imposition of the costs, amounting to $1,025. The Uniform Enforcement Act, N.J.S.A. 45:1-25, provides that in any action brought pursuant to the act "a board or the court may order the payment of costs for the use of the State." This represents the first enactment of this provision and cannot be construed with respect to the imposition of penalties by the Board as a legislative interpretation of a preexisting right on the part of the Board to impose costs. The fact that appellant failed to object to the imposition of costs is not tantamount to the grant of power which did not otherwise exist in the Board.
It has long been held that the right to costs is statutory and their allowance depends upon the terms of the statute. Lehigh Valley R.R. Co. v. McFarland, 44 N.J.L. 674 (E. & A. 1882). See State v. Mulvaney, 61 N.J. 202 (1972). We are unable to reconcile these and similar holdings with the Board's arguments to the contrary. Accordingly, we reverse that part of the final order and decision which imposed said costs to be paid by appellant.

CONCLUSION
The final order and decision is affirmed except as otherwise modified by eliminating recovery of costs in the sum of $1,025.
NOTES
[1] The $3,600 was stated to be $200 for each of the 18 patients unethically billed.
[2] The hearing examiner noted that in disbarment proceedings against an attorney the quantum of proof sufficient to warrant disbarment for unethical conduct or unfitness is the standard of "clear and convincing" evidence, as distinguished from a preponderance of the evidence. In re Pennica, 36 N.J. 401 (1962). This case was followed by In re Shear, 72 N.J. 474 (1977); In re Sears, 71 N.J. 175 (1976); In re Thompson, 67 N.J. 26 (1975); In re Gross, 67 N.J. 419 (1975); In re Rockoff, 66 N.J. 394 (1975). On the other hand, it appears that in proceedings before an administrative agency "it is only necessary to establish the truth of the charges by a preponderance of the believable evidence * * *." Atkinson v. Parsekian, 37 N.J. 143, n. (1962) (suspension of motor vehicle drivers' licenses); In re Darcy, 114 N.J. Super. 454, 458 (App. Div. 1971) (proceedings before Civil Service Commission affirming termination of services of motor vehicle inspector employed by Division of Motor Vehicles). The distinction between the quantum of proof necessary in disciplinary proceedings involving attorneys and other professionals is particularly noted in In re Kerlin Suspension or Revocation of License, 151 N.J. Super. 179, 184, n. 2 (App. Div. 1977). Although we are constrained to follow the distinction, we fail to understand why it should exist. See 70 C.J.S. Physicians and Surgeons § 18 at 896.