189 N.J. Super. 491 (1983)
460 A.2d 1057
NEW JERSEY DEPARTMENT OF THE PUBLIC ADVOCATE, APPELLANT,
v.
NEW JERSEY BOARD OF PUBLIC UTILITIES AND HACKENSACK WATER COMPANY, RESPONDENTS. COUNTY OF BERGEN, APPELLANT,
v.
DEPARTMENT OF ENERGY, BOARD OF PUBLIC UTILITIES AND HACKENSACK WATER COMPANY, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 23, 1983.
Decided March 28, 1983.
*495 Before Judges MATTHEWS, ANTELL and FRANCIS.
Stephen B. Genzer, Deputy Public Advocate, argued the cause for appellant (Joseph H. Rodriguez, Public Advocate of New Jersey, attorney; Stephen B. Genzer, William L. Roughton, Jr. and Helene Wallenstein, Assistant Deputy Public Advocates, of counsel and on the briefs).
Heikki Leesment, Deputy Attorney General, argued the cause for respondent Board of Public Utilities (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; Andrea M. Silkowitz, Deputy Attorney General, of counsel, Heikki Leesment on the brief).
William F. Hyland argued the cause for respondent Hackensack Water Company (William F. Hyland and Edward K. DeHope on the brief).
Stephen R. Spector, Bergen County Counsel, attorney for appellant County of Bergen.
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
*496 On April 22, 1980 the Hackensack Water Company (company) filed a petition for a rate increase with the New Jersey Department of Energy, Board of Public Utilities (Board), to be effective May 22, 1980. For the 12 months ending December 31, 1981 the proposed rate increase would produce estimated additional gross annual revenues of $10,299,000 (after adjustments for increases or decreases in rate base, operating revenues and expenses), an overall rate of return of 11.81% and a return on equity of 18%.
The company believed that the rate increase was necessary because of inflation and the high cost of borrowing money, and its plans for capital expenditures of $200,000,000 over the next decade, including $75,456,000 for an undertaking designated as the Two-Bridges Project. While the company had been granted a 13.75% return on equity by order of the Board on January 17, 1980, pursuant to an earlier petition for a rate increase, it had received an unfavorable reception to a sale of its stock shortly after that grant and thus sought a higher authorized return in order to attract investors.
Rate Counsel of the Public Advocate's Office (Rate Counsel) and the County of Bergen contested the proposed increase, and the case was transferred to the Office of Administrative Law to be decided as a contested case pursuant to N.J.S.A. 52:14F-1 et seq.
The Board reminds us that the filing of the petition predated by several months the exceedingly dry summer of 1980, and the drought emergency which was first declared on September 12 and which intensified until the spring of 1981. That crisis, which impacted most severely upon the northeast part of the State and particularly in the service area of Hackensack Water Company, Executive Order No. 94 September 12, 1980, was apparently a major consideration in the Board's handling and disposition of this case.
*497 After filing of the petition the Board suspended the proposed increase for two four-month periods by operation of N.J.S.A. 48:2-21.
Prior to the start of the hearings the parties had reached an agreement that the period September 30, 1979 to September 30, 1980 would constitute the test year for purposes of determining the necessity of the requested rate increase. The data was to be adjusted for "known and anticipated changes" and was updated throughout the hearings. On October 29, 1980, the final hearing date, actual financial data for July, August and September 1980 was entered in the record. The purpose of testimony and evidence presented at the hearings was to establish the company's rate base, operating income, operating expenses, rate of return and tariff design.
On November 24, 1980 the record in the case was closed. At that time the company maintained that it was entitled to $10,299,000 in additional revenues, while Rate Counsel and the County of Bergen claimed that the company was only entitled to a $1,577,000 increase. The staff, in its brief, recommended an increase in annual revenues of $3,899,000.
The administrative law judge (ALJ) issued her initial decision on January 6, 1981. She recommended a revenue increase of $1,581,000. The ALJ made extensive findings and recommendations on rate base, operating and maintenance expenses, rate of return and tariff design.
The parties filed exceptions and replies to exceptions to the initial decision of the ALJ during the latter half of January 1980.
On February 18, 1981 the Board issued a provisional decision and order rejecting the ALJ's recommendations and report in toto, and authorizing an interim rate increase for the company on the basis of Rate Counsel's position respecting revenue issues. In doing so the Board noted that the amount of the interim award was uncontested, that the test year employed in this case was not reflective of the "ever emerging water crisis now upon *498 us" and that the ALJ's recommendations "contain policy statements which the Board does not wish to endorse." In implementing the interim rate award, the Board also restructured the tariffs to remove minimum usage provisions so that the cost of water would be entirely usage-sensitive to aid the conservation and rationing effort.
On March 17, 1981 the Board issued its Decision and Order on Revenue Requirements and Rate Design which was followed with a written order on March 20. The Board noted the fact that although the petition for rate relief was filed in April 1980, hearings did not commence until August and the case was not returned to the Board for final determination until January 1981. The Board recognized, accordingly, that the hearing record "cannot account for the financial implications of the drought that is upon us, and the consequent curtailment of revenues, additional expenses and associated risk of investment." The Board also took official notice of Executive Orders Nos. 94, 96, 97, 98, 103 and 104 which dealt with emergency measures imposed by the Governor to deal with worsening water crisis. On its review of the record and in light of its concerns regarding the impact of the increasingly severe drought, and updated information, the Board issued an opinion which differed with the initial decision of the ALJ in many significant areas. Rate Counsel's brief challenges particular elements of the Board's order and sets forth specific bases for his disagreement with the Board on those issues.
Rate Counsel argues that the Board failed to make necessary findings of fact or to state the reasons underlying its decision and order of March 17, 1981, and seeks to have the cause remanded for formulation of a rate order based on precise findings and conclusions. Specifically, Rate Counsel contends that an administrative agency, when rejecting the findings of an administrative law judge, must, in specific terms, point out where it disagrees with the ALJ and why. The Board in this case rejected in toto the findings and recommendations of the *499 ALJ, and Rate Counsel argues that the Board did not present the basis for its disagreement with the judge.
We note briefly the standard of review that this court must apply to decisions and orders of the Board. In In re Jersey Central Power & Light Co. Petition, 85 N.J. 520 (1981), the court stated:
Before considering each of the claims presented, we note the limits of our review of the Board's actions. In Public Service Coordinated Transport v. State, 5 N.J. 196 (1950), this Court observed that "rate making is a legislative and not a judicial function, and that the Board of Public Utility Commissioners, to which the Legislature has delegated its rate-making power is vested with broad discretion in the exercise of that authority." Id. at 214. Thus, the Board's rulings are entitled to a presumptive validity and will not be disturbed unless we find a lack of "reasonable support in the evidence." In re New Jersey Power & Light Co., 9 N.J. 498, 509 (1952). [85 N.J. at 526-527]
In Mayflower Securities v. Bureau of Securities, 64 N.J. 85 (1973), the court explained the role of the appellate court in reviewing the findings of a state agency as that of determining: "`whether the findings made could reasonably have been reached on sufficient credible evidence present in the record,' considering the `proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility ... and ... with due regard, also to the agency's expertise where such expertise is a pertinent factor." Id. at 92-93, citing Close v. Kordulak Bros., 44 N.J. 589, 599 (1965). See, also, Goodman v. London Metals Exchange, Inc., 86 N.J. 19, 28-29 (1981). Thus, the Board's order in this case should be set aside only if the essential findings of the Board were either illegally arrived at or not made. See New Jersey Bell Tel. Co. v. State, 162 N.J. Super. 60, 72 (App.Div. 1978).
Our initial task is to determine what findings and conclusions the Board is required to make and whether they were, in fact, made. If the Board made sufficient findings, then we must determine whether there is reasonable support in the evidence for those findings.
The Administrative Procedure Act provides in N.J.S.A. 52:14B-10(d):

*500 A final decision or order adverse to a party in a contested case shall be in writing or stated in the record. A final decision shall include findings of fact and conclusions of law, separately stated and shall be based only upon the evidence of record at the hearing, as such evidence may be established by rules of evidence and procedure promulgated by the director.
Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings. The final decision may incorporate by reference any and all of the recommendations of the administrative law judge.
In In re Plainfield-Union Water Co., 11 N.J. 382 (1953), the court noted that appellate courts "cannot exercise their duty of review unless they are advised of the considerations underlying the action under review." Id. at 396. The court held that "[t]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acts be `clearly disclosed and adequately sustained.'" See East Windsor Reg'l Bd. of Ed. v. State Bd. of Ed., 172 N.J. Super. 547, 552 (App.Div. 1980).
Thus, an agency must indicate how it weighed the evidence before the ALJ and the ALJ's findings in order that an appellate court can determine the sufficiency of the evidence or the adequacy of its evaluation by the agency. See St. Vincent's Hospital v. Finley, 154 N.J. Super. 24, 31 (App.Div. 1977). The Board was required to limit its consideration to the record made before the ALJ, N.J.S.A. 52:14B-9, which includes the recommended report and decision of the ALJ. N.J.S.A. 52:14B-10(c); St. Vincent's, supra, 154 N.J. Super. at 30.
Rate Counsel claims that the rule for which he argues is a logical extension of the rule that the grounds upon which an agency acts must be clearly disclosed and adequately sustained. Rate Counsel relies heavily on St. Vincent's Hospital v. Finley, 154 N.J. Super. 24 (App.Div. 1977), a case in which this court reversed and remanded a decision of the Health Care Administrative Board on the grounds, among others, that the findings of fact and conclusions of law were insufficient to permit meaningful review of the Board's decision because the record was barren of any indication as to how, if at all, the Board evaluated the *501 proof before the hearing officer or his report and recommendations. The Board had rejected the recommendation of the hearing officer. 154 N.J. at 29-33.
The court in St. Vincent's discussed the "vulnerability of an administrative determination which does not specifically explain its rejection of a contrary finding of a hearing officer." The case can fairly be read to require that (1) an agency expressly indicate a disagreement with an ALJ, and (2) it set forth the basis of disagreement with the ALJ. Such a rule is necessary to allow an appellate court to perform its function of assuring that the agency has given reasoned consideration to all the material facts and issues. Id. at 32 (citing Greater Boston Television Corp. v. F.C.C., 143 U.S.App.D.C. 383, 444 F.2d 841 (D.C. Cir.1971), cert. den. 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971), reh. den. 404 U.S. 877, 92 S.Ct. 30, 30 L.Ed.2d 125 (1971). The court in St. Vincent's remanded the matter to the Board to make "`findings of fact and conclusions of law, separately stated' (N.J.S.A. 52:14B-10(d)), with respect to the entire record, including the proofs before, and the report and recommendations of, the hearing examiner." 154 N.J. Super. at 33.
Rate Counsel also argues that the rule that an agency must acknowledge and explain its disagreements with the ALJ's decision is dictated by the creation of the Office of Administrative Law through which the Legislature intended to "create an independent corps of administrative law judges that would seek to preserve the expertise that results from single-agency assignment and eliminate the unavoidable tendency to predisposition that comes from hearing the cases of a single agency over an extended period of time." Rate Counsel argues that this intent is entirely defeated if any agency may disregard an ALJ's decision whenever it chooses, without regard to the merit of any part of the initial decision's findings.
The Office of Administrative Law was established by L. 1978, c. 67, N.J.S.A. 52:14F-1 et seq., in order "to create a central independent agency staffed by professionals with the *502 sole function of conducting administrative hearings ... to eliminate conflict of interests for hearing officers, promote due process, expedite the just conclusion of contested cases and generally improve the quality of administrative justice." Statement of the Senate Committee on State Government, Federal and Interstate Relations and Veterans Affairs to Senate Bill 766. The statute did nothing to change the role of hearing examiners as they had functioned to that point. N.J.S.A. 52:14B-10(c), as amended by L. 1978, c. 67, describes the administrative process:
All hearings of a state agency required to be conducted as a contested case ... shall be conducted by an administrative law judge.... A recommended report and decision which contains recommended findings of fact and conclusions of law and which shall be based upon sufficient, competent, and credible evidence shall be filed, not later than 45 days after the hearing is concluded, with the agency.... The head of the agency, upon a review of the record submitted by the administrative law judge, shall adopt, reject or modify the recommended report and decision no later than 45 days after receipt of such recommendations. Unless the head of the agency modifies or rejects the report within such period, the decision of the administrative law judge shall be deemed adopted as the final decision of the head of the agency. The recommended report and decision shall be a part of the record in the case. [Emphasis supplied]
The ALJ's report is thus but one of many items in the record to be considered by an administrative agency. To make this fact very clear, the Legislature enacted N.J.S.A. 52:14F-7(a):
Nothing in this amendatory and supplementary act shall be construed to deprive the head of any agency of the authority pursuant to Section 10 of P.L. 1968, c. 410 (C. 52:14B-10) to determine whether a case is contested or to adopt, reject or modify the findings of fact and conclusions of law of any administrative law judge.
Moreover, the sponsors of Senate Bill 766, which ultimately became L. 1978, c. 67, provided in the statement accompanying the bill that "[a]s under existing law, however, the head of an agency will himself exercise the ultimate options of adopting, rejecting or modifying the setting [sic] proceedings." See Statement Accompanying Senate Bill 766, January 30, 1978, p. 9.
The effect upon judicial review of an agency decision that is contrary to the recommendations of an independent hearing *503 officer was addressed squarely in In re License of Suspension of Silberman, 169 N.J. Super. 243 (App.Div. 1979), aff'd o.b. 84 N.J. 303 (1980). There an appeal was taken by a podiatrist from a final order of the Board of Medical Examiners revoking his license and assessing a penalty and investigatory costs. The Attorney General had accused Silberman of charging Blue Cross-Blue Shield and Medicaid patients for more expensive podiatric services than he actually performed, and with subjecting patients to unnecessary x-ray exposure merely to claim payments from insurance companies. Thereafter hearings were held before an examiner who recommended that a judgment of not guilty be entered. The Board rejected the examiner's recommendation, made independent findings of fact and entered a final order revoking the podiatrist's license. The Board concluded that the independent examiner, a retired judge, had erroneously applied what amounted to a criminal standard of proof.
In affirming the decision of the Board, we acknowledged the superior status of an agency's decision in relation to that of a hearing examiner, and stated:
If we were reviewing the findings of the retired judge, as such, in a judicial setting, we would be bound to uphold same. Mayflower Securities v. Bureau of Securities [64 N.J. 85] and Close v. Kordulak Bros. [44 N.J. 589], both supra. However, we are not reviewing the examiner's findings in such a setting  we are reviewing the findings of the Board. N.J.S.A. 52:14B-12. Therefore, as already stated, we must affirm if its findings are supported by substantial credible evidence.
... The hearing examiner's report and recommendations, including his findings, are not exhausted or otherwise dismissed if rejected by the administrative body to whom the report is transmitted. We are entitled to review those findings and recommendations in our overview of the record, for the purpose of determining whether or not the Board's findings are supported by substantial credible evidence. Although we are not referred to any case in this State which expressly enunciated this rule, it appears to be a reasonable one and is that which is followed by our federal courts. See 2 Davis, Administrative Law Treatise, § 10.04 at 18 (1958), supplemented 1970 Supp. at 410 and 1976 Supp. at 314. See New Jersey Bell Tel. Co. v. State, 162 N.J. Super. 60 (App.Div. 1978).
While the Board, sitting in a quasi-judicial capacity, "cannot be silent witnesses as well as judges," N.J. State Bd. of Optometrists v. Nemitz, 21 N.J. Super. 18, 28 (App.Div. 1952), an agency's "experience, technical competence, and specialized knowledge may be utilized in the valuation of the evidence." N.J.S.A. 52:14B-10(b); Mayflower Securities v. Bureau of Securities, supra, 64 N.J. at 93; *504 New Jersey Bell Tel. Co. v. State, supra. Here the Board evaluated the evidence in the light of its expertise  an expertise not possessed by the hearing examiner. It carefully and sensibly considered the examiner's findings, statements and report, and demonstrated appropriate grounds for refusing to accept them in areas which affected the result. In this light, and finding as we do that the evidence with its reasonable inferences supports the Board's findings, we are enjoined to uphold the final order and decision except as stated hereafter.[1] [169 N.J. Super. at 255-256; emphasis supplied]
St. Vincent's Hospital v. Finley, 154 N.J. Super. at 24, represents the extreme case where an agency's decision is totally devoid of any indication that the agency even considered the report and recommendation of a hearing officer in reaching its final decision. It has no applicability to the case presently before this court.
Rate Counsel also relied upon Oil, Chemical and Atomic Wkrs. Int. U. Local 4-243 v. N.L.R.B., 362 F.2d 943 (D.C. Cir.1966), for the proposition that each disagreement with an ALJ must be addressed in specific terms. There a union charged that the buyer of a plant, which was operated under supervision of the seller for some 2 1/2 months subsequent to the passing of title to the buyer, had committed an unfair labor practice in failing to bargain with the union over the closing of the plant. The buyer had planned all along to close the plant after acquiring it. Nonetheless, a hearing examiner found in favor of the union. The National Labor Relations Board disagreed with the examiner, holding that the record contained insufficient evidence to warrant a finding that during the period between the buyer's purchase of the plant and its shutdown the relationship between the buyer and seller was one of joint employers, or coemployers, or agency. Such a relationship would have constituted the buyer as the employer of the employees at the plant, and would thus have obligated it to bargain with the union representing those employees. The Court of Appeals, D.C. Circuit, affirmed the Board:

*505 In our opinion there is substantial evidence in the whole record, including the Examiner's decision and findings, supporting the finding of the Board. For the most part the problem is one of drawing inferences from evidentiary facts. We may assume for present purposes that there was substantial evidence to support the findings of the Examiner, even though these were based on circumstantial evidence. The Board is, however, the agency entrusted by Congress with the responsibility of making findings in cases arising under the statute, and it is not precluded from reaching a result contrary to that of the Examiner when there is substantial evidence in support of each result.

The Board cannot satisfy its statutory function merely by stating that it disagrees with a trial examiner. It must make clear the basis of its disagreement. Its decision must be presented in such form as to enable this court to pass intelligently on that decision, and to determine whether it is rationally related to findings and supported by substantial evidence. In our opinion, the Board properly discharged this function. Its decision sets forth and makes clear that the Examiner's decision was given attentive consideration. The Board did not take up every evidentiary item discussed by the Examiner. No such requirement can reasonably be implied. It suffices that the Board addressed itself to key items of evidence which were crucial in terms of the Company's alleged status as employer, and fairly indicated the basis on which it was drawing inferences contrary to those of the Examiner. [362 F.2d at 945-946; emphasis supplied; citations omitted]
Thus, so long as the Board in the case at bar evaluated those differences with the ALJ which were crucial to its decision, it fulfilled its duty. The Board had no obligation to discuss in detail every point of disagreement with the ALJ.
In New Jersey Bell Tel. Co. v. State, 162 N.J. Super. 60 (App.Div. 1978), we affirmed a decision by the Board which concluded that New Jersey Bell was earning an adequate rate of return, and stated:
Although the decision and order of the Board did not coincide with the recommendations made by the hearing examiners,
* * * [I]n the last analysis it is the agency's function, not the Examiner's, to make the findings of fact and select the ultimate decision, and where there is substantial evidence supporting each result it is the agency's choice that governs. [Greater Boston Television Corp. v. F.C.C., 143 U.S.App.D.C. 383, 395, 444 F.2d 841, 853 (D.C. Cir.1970), cert. den. 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)]
Nor is it reasonably to be expected that the Board should discuss each of the evidentiary items analyzed by the examiners. Oil, Chemical & Atomic Workers Int'l U. Local 4-243 v. N.L.R.B., 124 U.S.App.D.C. 113, 116, 362 F.2d 943, 946 (D.C. Cir.1966). And in technical matters which lie within the special competence of the administrative tribunal, the courts will defer to the agency's expertise. In re Application of Howard Savings Bk., 143 N.J. Super. 1, 11 (App.Div. 1976). [at 76-77]
*506 Nor do we read St. Vincent's Hospital v. Finley, 154 N.J. Super. 24, as holding that the Board has an obligation to discuss every evidentiary item that the ALJ has analyzed and with which the Board has a disagreement. Rather, the Board's decision must demonstrate that the agency gave attentive consideration to the ALJ's recommendation as part of the record and address itself to key items of evidence which were crucial to its decision. New Jersey Bell Tel. Co. v. State, supra, 162 N.J. Super. at 77.
The Board issued a provisional decision and order rejecting the recommendations of the ALJ in toto, and thereby provisionally set forth its disagreement with the ALJ. As the basis for its rejection of the ALJ's recommendations the Board stated that the record contained a 1979-1980 test year which had not kept pace with the water crisis (drought) existing at that time, and that the ALJ's recommendations were broadly written and contained policy statements that the Board did not wish to endorse. The rationale for the Board's action is stated in its Provisional Decision and Order of February 17, 1981:
We therefore have before us a case where the statutory suspension period has expired and the statutory 45 day review period is close at hand. More important, we have before us a record containing 1979-1980 test year which has not kept pace with the ever emerging water crisis now upon us. It should be noted that the submission of ALJ ... is, by statute, a "recommendation" which only has the force of law if adopted by the agency head or upon the expiration of the statutory review period without Board action. N.J.S.A. 52:14B-10(c). As most clearly stated in N.J.S.A. 52:14F-7a, nothing in this act shall be construed to deprive the agency head of its authority to review or modify the determinations of any ALJ. Because of the above combination of circumstances, coupled with a very broadly written set of recommendations, which contain policy statements that this Board does not wish to endorse. The Board HEREBY REJECTS the recommendations of the ALJ en toto. The case therefore stands before us on the basis of the record and the position papers of the parties.
Although the Provisional Decision and Order stated that the Board rejected the recommendations of the ALJ in toto, the fact of the matter is that this rejection was, as the order itself was entitled, only provisional. The final Decision and Order entered by the Board on March 17, 1981, and the schedules attached thereto, not only make clear that the Board gave consideration *507 to the recommendations of the ALJ, but in fact concurred with many of them.
Although we are considering the ALJ's report as part of the record, we emphasize that the Board is the primary factfinder in this case and that it is the Board's order and decision that we are reviewing. The Board has ultimate authority, upon a review of the record submitted by the ALJ to adopt, reject or modify the recommended report and decision of the ALJ, N.J.S.A. 52:14B-10(c), and an appellate court is only entitled to review those findings and recommendations in its overview of the record for the purpose of determining whether or not the Board's findings are supported by substantial credible evidence. In re License of Suspension of Silberman, 169 N.J. Super. at 255-256.
We turn to the record before us.
The Board's determinations fall into three categories: (a) rate base items, (b) operation and maintenance expenses and (c) the rate of return applied by the Board to the rate base determination.
"The determination of an adequate rate base is ... fundamental in any rate proceeding. The rate base is the fair value of property of the utility that is used and useful in the public service." Public Service Coord. Transport v. State, 5 N.J. 196, 217 (1950); State v. New Jersey Bell Tel. Co., 30 N.J. 16, 29-30 (1959).
The Board's final order found a net investment rate base of $112,983,000. The ALJ had recommended $110,764,000. The difference, in excess of two million dollars, lies principally in the components of deferred costs, working capital, customer deposits and the reserve for injuries and damage.
In the course of rate setting it is required that the Board determine the working capital requirements of the applicant utility. Working capital is a calculation of the cash needed by the utility to meet its current expenses prior to receipt of revenues from its customers as payment for the utility service or *508 product provided. This calculation acknowledges that the company incurs various costs and expenses in providing the service that it is not able to recover until a point later in time when it bills its customers and receives payment. An allowance for working capital permits the company to continue in operations until the revenues from its customers are actually received.
The most accurate way of determining working capital is by a comprehensive lead-lag study that analyzes the time interval between the payment of expenses and the receipt of revenues by the company. The Board recognized that "such studies are time consuming and expensive." Consequently, it has become commonplace for a formula approach to the working capital computations to be used in this jurisdiction. Most often the approach used is the so-called FPC method, which was devised by the Federal Power Commission in an effort to expedite rate base determinations, and avoid the cost of detailed lead-lag studies. As noted in the Board order, it frequently uses the FPC method which basically assumes there is a cash turn-around every 45 days, and therefore sets working capital requirements at 1/8 of the test year Operating and Maintenance Expense ("O & M") total. In this State the FPC formula is sometimes "modified" to reflect such considerations as the impact upon cash of increases in gross receipts and franchise tax revenues and from accrued interest. Both of these modifications were applied by the Board arriving at the company's working capital total.
From time to time the Commission may require a lead-lag study to verify the applicability of the formula approach. This usually is done prospectively, as in the present case:
While we recognize that a properly prepared lead-lag study would provide a superior approach to determining the Petitioner's working capital requirement, we recognize that such studies are time consuming and expensive, and for many utilities, may not be a cost effective method of determining working capital.
It is time for a lead-lag study in the next base rate case, to be submitted and supported by petitioner. [Order at 5]
Although the ALJ considered the "balance sheet" method espoused by appellant's witness to be more reliable, we believe *509 that the ALJ was persuaded largely because of the witness' reference to a "close correlation of the results [achieved under the "balance sheet"] with those of an updated lead-lag study." The basic study which the witness "updated," however, was performed in 1977 for a prior rate case by a Mr. Effron. Appellant's witness below did not know what methodology was employed and Effron, who performed the study, was never called as a witness.
In attacking the FPC method because it originally was constituted for electric companies, Rate Counsel fails to address the fact that the only significant adjustment for a nonelectric company such as Hackensack involves a recognition in computation of the lag factor that the billing cycle is quarterly rather than monthly, as is the case with the electric utilities.
Rate Counsel contended for, and the ALJ accepted, a so-called balance sheet approach to the working capital formulation, claiming that that approach would be a more acceptable substitute for a lead-lag study. The short answer to this position is that the adoption of a particular formula is clearly within the expertise of the Board. The Board has repeatedly rejected the balance sheet formula approach.
Rate Counsel's effort to establish the balance sheet method in these proceedings is totally unconvincing, and certainly did not warrant the ALJ's conclusion that it is more reliable than the conventional approach.
Thus, the Board was faced with a choice of using its traditional formula, the modified FPC method, or of using a discredited one, the balance sheet approach, offered by a witness who could not defend it. We find that the Board properly exercised its expertise in rejecting the ALJ's support for this disfavored approach, and we find ample support in the record for this action.
The next issue raised by Rate Counsel deals with the Board's allowance for deferred costs. Although the ALJ permitted the inclusion of $62,333.80 for sludge lagoon cleaning, she declined *510 to include $48,654.77 for unamortized rate case expenses. The ALJ recognized, however, that the inclusion of rate case amortization is consistent with proper accounting principles. In rejecting the reasoning of the ALJ, the Board adopted the position of its staff on the issue, noting that it is "consistent with the test year concept" and that the magnitude of this item "can vary due to the time frame selected as a test year and the level of forecast plant additions."
The Reserve for Injuries and Damages was set by the company at an amount sufficient to cover its estimated total liability for injuries and damages resulting from operations. Although Rate Counsel sought to have $207,000 of this item removed from Rate Base with claims that this account is available to the company for the purchase of plant and equipment as a substitute for investor supplied cash, the ALJ instead disallowed $100,000. In doing so the ALJ apparently averaged payments from this account over the past several years and disallowed amounts in excess of this historic average as thus calculated. The historic average did not take into consideration the company's own best estimate of injuries and damage claims to be paid during the year. The Board permitted the entire balance to be included in rate base, in accordance with its past treatment of this item and its concurrence as to the company's judgment respecting payments to be made from this reserve.
Rate Counsel also challenges the rather minor item of customer deposits. The company had projected this item to amount to $35,000 at the end of 1981, which the staff of the Board did not challenge. The ALJ stated that this figure was "speculative at this time" and instead adopted the sum of $43,245, which was the amount in this account at the end of the test year. It appears that the sole basis for the ALJ having selected the recommended figure lies in the fact that this was the actual amount in the test year. She did not find that the company's projection was unreasonable or unrealistic.
*511 The company contended in its petition that the new rates to be set by the Board should allow for the recovery of $25,014,000 in Operating and Maintenance Expenses. Rate Counsel alleged this recovery should be $22,964,000 instead. The ALJ recommended $23,356,000. The Board accepted the staff recommendation of $24,054,000. Operating and Maintenance Expenses include such categories as Wages and Salaries, Chemical Expenses, Hospitalization and Group Insurance, Pension Expense, Rental Expense, and such miscellaneous items as Interest on Customer Reports, Charitable Contributions and Uncollectible Accounts.
The company suggested an allowance for Wages and Salaries of $9,195,000, which represented actual outlays as required by its collective bargaining agreement. Rate Counsel suggested $9,253,835, which was based on the assumption of an annual 9.5% increase effective March 1, 1980, and a 9% increase effective March 1, 1981. As stated by the ALJ in her Initial Decision:
Since no party presented testimony on this issue, and all parties but Bergen County agree to the reasonableness of the increase generally, the hearer is of the belief that the conclusory statements of the company as to reasonableness must be accepted if they do not controvert the noticed COWPS guidelines (maximum of 9.5% (Federal Register, Vol. 45, No. 54, March 18, 1980, page 17125), [sic] which the hearer regards as a general standard. [Emphasis supplied]
The ALJ then applied her own standard of reasonableness and recommended denial of recognition of certain raises granted officers and directors.
The only party to question the Wages and Salaries item, Bergen County, did not state what its objections were, and merely declared in its brief to the ALJ: "It is within the Court's authority to disregard the amount of the contractual increases, or part thereof, if it has not been satisfied that the same are reasonable." The Board thus was faced with accepting the company's actual known wages and salaries expense, as supported by the staff, Rate Counsel and the company, or of accepting the ALJ's deduction of $38,000, on the basis of her own conception of salary guidelines, which were no longer *512 pertinent.[2] It was well within the Board's discretion to accept actual known wages and salaries. It was under no obligation to address the ALJ's arbitrary use of nonmandatory guidelines.
The ALJ disallowed $29,000 in Chemical Expenses on the basis that there was "nothing in the record or noticeable from which a 13% inflation trend can be derived." However, as the Board's Order pointed out, the company's claimed expenses for chemicals were based on the latest actual prices of chemicals, as reflected in an exhibit in evidence. Neither the company nor the staff, which supported the $1,119,000 figure, projected any inflation trend in chemical costs. Prior to accepting the company's figures, the staff independently verified the company's claimed cost figures. It then recommended that the company receive the full allowance it had requested. The Board's order in accepting the staff finding is fully supported by the record.
With respect to Hospitalization and Group Insurance, the ALJ accepted the position of Rate Counsel which advocated the sum of $613,000. This figure was based upon the actual amount spent during the test year and allocated the same way as wages. The ALJ recognized, however, that this item was scheduled to increase as the result of improvements in coverage effective January 1, 1980, and therefore not fully reflected in the test year figures. In declining to adopt the company's proposal, the ALJ applied the COWPS pay standard and noted that this standard applied to fringe benefits as well as wages or salaries. She concluded that "managerial workers particularly appear to have received increases on the high side" and thus she refused to permit any amounts in excess of the test year actual figure. The ALJ also refused to permit any increases in hospital/medical insurance beyond test year actuals. She stated that the *513 company's use of "[t]rending the experience-related group medical and hospital coverage cost by the least squares method using prior monthly and annual contract costs is actuarially unsound." Instead, the ALJ stated: "To trend properly, one would need trends for two components: incidence of claims per contract and costs per claim. It would also be necessary to know the contract provisions concerning reserves, administrative costs per contract and retroactive adjustments." Noting that the ALJ had not taken into account any changes after the test year, the Board adopted its staff's position on this issue.
Although Rate Counsel proposed an allowance of $1,145,000 below, a figure only $35,000 less than that requested by the company, he now argues that the Board's adoption of the company figure of $1,180,000 for Pension Expense, as recommended by the staff, was "arbitrary" and demonstrated a "nonchalance as regards the record ..." The ALJ recommendation was $931,000. The ALJ stated that the "only appropriate method for determining a reasonable pension expense starts with actuarial evaluation," and she found that the gross cost for 1980 was $1,354,476 as stated in actuarial valuation; she refused to accept this figure as the starting point for determining pension expense. Instead, she noted that $1,354,476 is only the "intermediate payment" that the company could make to the pension plan, and that it could instead elect the "minimum payment" of $1,247,752. The ALJ did not find that the "intermediate payment" proposed by the company was unreasonable or improper; nevertheless she accepted the "actual minimum pension cost for 1980" of $1,247,752.
The company provided an Actuarial Valuation of Retirement Plans Covering Employees of both Hackensack and Spring Valley Water Companies  January 1, 1980, which showed an annual cost of $1,354,476. Rate Counsel argues the amount allowed by the Board, $1,180,000, cannot be reconciled with this annual cost, and decreased that sum by 7.36% for allocation to capital programs, thereby leaving $1,254,786. Rate Counsel, however, *514 failed to deduct an additional 5.5% for the amounts chargeable to Hackensack's subsidiary, Spring Valley Water Company.
The company had also requested a 1981 projected allowance of $165,000 for rental fees, of which the largest item and the only contested item was rented computer time (Tymshare). Although the actual expenditure for rental fees during the test year came to $148,261, the ALJ speculated that this sum "could reflect [the company's] effort to validate its own projection by advancing and initiating nonrecurring start-up program," and thus refused to allow that actual amount for 1981. The ALJ arrived at her allowance of $53,300 for Tymshare by accepting Rate Counsel's recommended allowance of $107,300 and subtracting the uncontested items from that figure. The arbitrariness of this calculation is apparent when the basis of Rate Counsel's recommendation is reviewed; Rate Counsel took the company's projection for the first nine months of 1980 and added the company's actual expense for the last three months of 1979. The ALJ did not explain why calculation by Rate Counsel was any more reasonable than the actual expenditure experienced by the company at the close of the test year. On that basis the Board rejected the ALJ's determination of this issue and instead found that the company's projection for 1981 rental costs was appropriate.
Rate Counsel contends that the Board's order is unsupported as to the amounts claimed by the company for Gasoline, Interest on Customer Deposits, Charitable Contributions and Uncollectibles, but does not develop a factual basis for his argument.
The Board permitted the company a gasoline allowance of $244,000, based on its projected 1981 cost of $328,000 multiplied by a factor of .7443. The company's projection was based on an assumption that a 10¢ a gallon import tax would be adopted. It was not. On the other hand, the Board, concerned that decontrol of domestic crude oil would raise prices, accepted Hackensack's figure without adjustment. This conclusion was reasonable since it was based on a projected gasoline cost of *515 $1.23 a gallon in 1981, which clearly has been realized, if not exceeded.
The ALJ apparently assumed a lower usage of gasoline for 1981 than the actual latest 12 months' usage and deducted the 10¢ a gallon of unrealized cost due to legislative inaction on the import tax, giving rise to a figure of $225,000.
We do not regard it as unreasonable for the Board to have taken into account the decontrol of domestic crude oil as a justification for accepting the company's figure.
The Board arrived at its interest on customer deposits figure by applying 9% to the projected level of deposits at the end of 1981. The $1,000 difference in customer deposits between the Board and ALJ is hardly worth extensive comment.
Also of little consequence is the claim that the Board's allowance of $25,000 in charitable contributions for 1981 was unreasonable. Rate Counsel supported this figure below. Rate Counsel now cites the Board's rejection of the ALJ's sua sponte recommendation as "additional evidence of the decision's fatal defects." The Board has consistently permitted reasonable, nondiscriminatory charitable donations to qualify as operating expenses in a utility rate case. Notwithstanding the absence of any objections to these minimal allowances, the ALJ imposed her own social policy on the company. The Board rejected her reasoning, pointing out that only .00053% of pro forma revenues was involved and that it saw no reason to change its policy.
The standard on rate of return was set by the United States Supreme Court in Federal Power Comm'n v. Hope Nat. Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1953):
... [T]he return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise so as to maintain its credit and to attract capital. [at 603, 64 S.Ct. at 288]
See Public Service Coord. Transport v. State, 5 N.J. at 225, for a statement of similar import.
*516 The Board was well aware of the fact that the company is proceeding with the Two-Bridges Project (recently renamed Wanaque South) under great pressure from state agencies to bring that major improvement into operation at the earliest possible date. Wanaque South is the largest water project ever undertaken in this State. The Board stated that the project, which "effectively doubles capital requirements in the next 5 years, becomes a legitimate concern in this docket as it applies to risk and return on equity."
The Board also took official notice of the disclosure statement sent by the company to its stockholders on February 9, 1981 alerting them to the company's current earnings picture. This statement, as noted by the Board, clearly created an investor perception of added risk. Finally, the Board took official notice of water "send-out" limitations under the state of emergency declared by Governor Byrne, which required the company to reduce its delivery of water to customers. This condition was seen by the Board as creating an added perception of risk by investors with respect to the company's expected return on equity. Thus, contrary to the suggestion of Rate Counsel, the Board gave effect to a variety of factors, as it should have, in setting the company's allowed rate of return on equity capital at 14.5%. The overall rate of return allowed on the company's combined classes of capital was 9.99%.
Rate Counsel attacks the equity determination on the ground that the Board rejected, and at the same time used, the Discounted Cash Flow analysis of Mr. Rothschild, Rate Counsel's expert. This argument is superficially appealing, but inaccurate. The Board reviewed the entire record, highlighting the more important considerations from among the various recommendations before it, and concluded:
The determination of the proper cost of equity is a matter which is governed not by any particular formula, but rather depends on the sound exercise of our informed judgment based upon the record. Although several formulaic approaches are contained in the record, we shall not adopt in toto any particular party's position in reaching our result.
*517 The application of the Board's expertise in a rate proceeding usually results in a tempering of the specific rate of return recommendations of the parties. The most common variable is the recommended return on the common equity portion of the overall capital structure. The cost of debt capital is generally only a matter of arithmetic, although sometimes this is not the case. Here a wide range of equity return recommendations was offered:

 Hackensack 18.00%
 Rate Counsel 13.30%
 Board Staff 14.25%
 ALJ 14.00%

The Board concluded that 14.50% was appropriate. It came to this conclusion after an extensive review of the record, including the impact the members thought the prevailing drought would have. The drought had created sufficient uncertainty as to the financial condition of the company and its capital needs. In view of that uncertainty, the Board took the unusual step of keeping the case docket open so that it could monitor the appropriateness of the rate level established.
While the Board rejected the particular application of the Discounted Cash Flow method by Rothschild ("We find Mr. Rothschild's use of the DCF method to be inappropriate"), it never stated that the DCF method was invalid per se. The Board has utilized the DCF formula in the past in numerous rate proceedings as an equity costing method. Moreover, Rothschild himself had declared:
The DCF, or Discounted Cash Flow Method of costing equity is probably the most commonly used equity costing method used today. The theoretical basis for the method (although not its implementation) is universally accepted in the financial world.
The Board in fact rejected the figures selected by Rothschild for use in his DCF formula calculations. His figures, even including his so-called "new financing growth adjustment," produced a 13.3% equity rate of return. This was far below the 13.75% allowed Hackensack a year earlier. The level of return in the earlier case was arrived at on the basis of a stipulation, to which *518 both Rate Counsel and Bergen County were parties. In view of currently increased perceptions of risk by investors because of the drought and from the doubling of investment soon to be required by the Two-Bridges Project, the Board found Rothschild's application of the DCF method, which produced a required rate of equity return 45 basis points below that set prior to these developments, to be unsupported.
The Board also found that the company's expert, Mr. Sanders, presented convincing data that the company's previously allowed rate of equity return (13.75%) was too low.
Rather than accept either expert's position in its entirety, the Board decided to permit a 14.50% rate of return on equity, being "unwilling to go higher without first assessing how this authorized return would impact Petitioner's ability to attract capital."
While the conclusions of the Board on the subject of rate of return may be open to some question, it is at least clear that the Board discharged its obligation to evaluate the evidence and to make a determination drawn from its historical expertise and from the record.
Finally, we note the criticism of Rate Counsel of the activities of the Board's staff. In our view, staff did what it was supposed to do; it made recommendations to the Board members as agency heads. Moreover, the staff placed those recommendations on the record, in the form of a brief and later by exceptions to the ALJ's recommendation. Thus, all parties knew the staff's position and each had ample opportunity to rebut any position of the staff with which there was disagreement.
There is no obligation on the part of the staff to present direct evidence prior to taking a position. The staff is not a partisan in the cause. Rather, staff is expected to advise the Board on the basis of the evidence presented by the active parties. Staff did not act as an advocate; it analyzed evidence submitted by the parties on the basis of its expertise and understanding of established Board policy, made recommendations *519 on the basis of its analysis and made these recommendations available to all parties and to the ALJ.
Reliance of Rate Counsel on the by now weary and much misapplied Mazza v. Cavicchia, 15 N.J. 498, 516-526 (1954), is misplaced. As we noted in New Jersey Bell Tel. v. State:
The misconduct found in Mazza consisted of the Director's use of a "secret report" prepared by a hearer in arriving at his administrative decision. .. . Crucially important was the fact that it was not furnished to the adversary. [162 N.J. Super. at 83]
Staff's analysis in the present matter was not secret. It was distributed to all parties. The interrelation between the Board and the staff "simply formed a part of the agency's reasoning process by which it arrived at ... an `institutional decision.'" N.J. Bell Tel. Co., 162 N.J. Super. at 83. In N.J. Bell, following receipt of the hearing examiner's report and exceptions thereto, the Board utilized its staff to summarize the positions of the parties. New Jersey Bell argued that the Board relied on data and recommendations not of record. The court rejected that allegation and stated:
... [N]owhere does the statute attempt to regulate the working relationship between the agency heads and their subordinates; in fact, the statute specifically recites "the agency's experience, technical competence, and specialized knowledge may be utilized in the evaluation of the evidence." N.J.S.A. 52:14B-10(b). [Id. at 82]
The Administrative Procedure Act does not prohibit an agency from utilizing staff suggestions in reaching a decision. The deference courts give to an agency's determination in matters within the agency's expertise is based in most instances on our recognition of the support of a professional staff. See, e.g., Close v. Kordulak Bros., 44 N.J. at 599; Mayflower Securities v. Bureau of Securities, 64 N.J. at 92-93; Essential S. & L. Ass'n v. Howell, 105 N.J. Super. 424, 432 (App.Div. 1969). An agency's expertise includes the expertise of its staff. So long as the final order of the agency has a basis in the record, the fact that the agency accepted the position of its staff as opposed to *520 that of the interested parties is of no moment. See N.J. Bell Tel. Co. v. State, 162 N.J. Super. at 82.
The order of the Board of Public Utility Commissioners is affirmed.
NOTES
[1] The court found a lack of statutory authority for the imposition of costs by the Board on Silberman. 169 N.J. Super. at 258-259. All other aspects of the Board's order were affirmed.
[2] The Council on Wage and Price Stability ("COWPS") standards imposed by the ALJ, 6 C.F.R. Parts 705, 706, 707, were terminated by Executive Order of President Reagan on January 29, 1981. A notice to the effect that the guidelines were not being continued for a third year was issued December 16, 1980, some three weeks prior to the ALJ's January 6, 1981 initial decision.