RALPH A. VILLANI, PROSECUTOR, v. MICHAEL P. DUFFY, DIRECTOR OF THE DEPARTMENT OF PUBLIC SAFETY OF THE CITY OF NEWARK, AND THE CITY OF NEWARK, DEFENDANTS.

Argued June 28, 1934—Decided November 21, 1934.

Before Justices TRENCHARD, HEHER and PERSKIE.

For the prosecutor, *Robert H. McCarter* (*Philip J. Schotland* and *Ferdinand D. Masucci,* on the brief).

For the defendant, *Thomas M. Kane* (*Frank A. Boettner,* on the brief).

The opinion of the court was delivered by

HEHER, J. Upon allegations of misconduct, which the departmental head found were sustained by the evidence,

prosecutor was removed from the office of judge of the Third Criminal Court of the city of Newark. Challenging the legality of the ouster, he sued out this *certiorari*, and now urges that the evidence is insufficient to support the judgment. It seems to be conceded that the power of removal for just cause resides in the director of public safety.

There are three charges of misconduct, variously stated, viz.:

(1) That prosecutor, with intent to cheat and defraud, did, on March 21st, 1934, while holding the mentioned office, falsely represent to one Joseph Galante that he "could obtain for the said Joseph Galante a permit for the use of the Centre Market plaza, * * * property of the city of Newark, for the purpose of selling flowers during the Easter season of the year 1934, and that the cost thereof would be $100," well knowing that a municipal ordinance relating to "transient merchants and itinerant vendors" provided for the granting of such licenses by the director of public safety, and, in such event, the payment by the licensee to the municipality of a fee of $300, and the posting of a bond; as a result of which Galante paid to prosecutor the sum of $100, of which the latter paid $50 to the municipality, and "fraudulently converted to his own use the sum of $50;" and that prosecutor did not apply to the director of public safety for the permit, but secured or caused to be secured a receipt from the department of parks and public property for $50, for rent of space in the Centre Market plaza, which he represented to Galante "to be the proper and sufficient permit or license for the sale of flowers;"

(2) That prosecutor, "contrary to and in violation of" the Motor Vehicle act (*Pamph. L.* 1921, *p.* 643, as amended by chapter 171 of the laws of 1931, *Pamph. L.* 1931, *p.* 347), released from imprisonment, on the day following their commitment, under a suspension of sentence, two men, Manna and Rutigliano, each of whom had been convicted on December 5th, 1933, upon a complaint charging that Manna, in violation of subdivision 2 of section 10 of the Motor Vehicle act (*Pamph. L.* 1931, *pp.* 347, 357), procured Rutigliano to

impersonate him in an examination conducted to determine his fitness to operate a motor vehicle, and committed to jail for a term of thirty days, in default of the payment of a fine of $200; and that he (Villani) untruthfully reported to the commissioner of motor vehicles that each defendant was committed to jail in default of the payment of the fine thus imposed; and

(3) That following the arraignment of one Leo Colton before him, in the Third Criminal Court of the city of Newark, on November 28th, 1933, upon a complaint charging assault and battery and robbery, and the holding of the defendant to bail in the sum of $5,000 to await the action of the grand jury, he informed the defendant's mother that an office associate in the practice of law would "represent" her son, and that "she would have to pay $50 to have her son released, and if he was indicted she would have to pay $50 more;" and that "he [Villani] must have $50 or he would not release her son."

The director of public safety made the following specific findings:

*Re Galante:* That prosecutor was "guilty of having been, to say the least, a party to a transaction which would have deprived the city of Newark of receiving (*sic*) revenue, namely, $300, for a permit as provided in the ordinance relating to new merchants, itinerant merchants, &c."

*Re Manna and Rutigliano:* That prosecutor was "guilty of having acted contrary to the statute, and of having attempted to induce the defendants, Manna and Rutigliano, who were to appear before him, to engage his office associate, Acocella, as counsel."

*Re Colton:* That prosecutor "attempted to induce Mrs. Colton to engage his office associate, Mr. Acocella, as counsel" for her son, informing her that "it would cost her $50 to have her son released." This finding, while somewhat vague and indefinite, bears but one interpretation, *i. e.,* that the mentioned sum was a counsel fee to be paid to Acocella; but it also implies that prosecutor, in his official capacity, would order the release of the incarcerated defendant, if

Acocella were retained. Such would, of course, be improper conduct.

There was a general finding, which the director seemed to regard as the basis for the judgment of ouster, that prosecutor was "guilty of improper and unbecoming conduct, thereby impairing his fitness and usefulness to continue as judge of the Third Criminal Court of the city of Newark."

It is the function of this court to determine disputed questions of fact. Section 11 of the *Certiorari* act provides that when such a writ issues to review the "suspension, dismissal, retirement or reduction in rank of any person holding an office or position, state, county, or municipal, from which he is removable only for cause and after trial, the court shall determine disputed questions of fact, as well as of law. * * *." 1 *Comp. Stat., p.* 405. Passing the question, raised by prosecutor, of variance, in substantial particulars, between the allegations and the specific findings, our analysis of the evidence adduced brings us to the conclusion that neither of the accusations of misconduct, upon which the judgment of ouster is apparently rested, is established.

*Re Galante:* The gist of this charge is that prosecutor was guilty of fraudulent conduct, in that he represented to Galante that the necessary permit for the sale of flowers upon the plaza premises could be had for $100, when, in fact, the permitee would be required to pay, in event that the necessary permission was granted by the director of public safety, a fee of $300. He was convicted of *participation* in a transaction that "would have deprived the city of Newark" of the license fee prescribed by an ordinance relating to the transaction of business by itinerant merchants and vendors. There is an utter lack of evidence to sustain this charge. Galante, a relative of prosecutor (the latter is a practicing lawyer), sought his aid in procuring the desired permit. Villani informed him that service of this character might be regarded as of questionable propriety, because it would necessarily involve a transaction with the municipality of which he was an officer, and suggested that he retain Mr. Joseph Lipman, also a practicing lawyer. Galante adopted the suggestion,

and paid $100 to Lipman—$50 to be paid to the municipality for the use of the plaza premises for a period of five days, and the balance to be retained by Lipman as his fee. Lipman's efforts to procure the necessary consent were in vain, and the money was refunded. Lipman testified that prosecutor asked him to "handle the matter for his uncle and aunt," and that the applicants agreed to pay him a fee of $50 for his services, which was to be returned in event that the required permit was not to be had. Lipman actually handled the transaction for Galante, and his testimony clearly establishes that Villani's role in the transaction was merely that of an intermediary for his relatives, and that he was not in any sense guilty of improper conduct. There is not a scintilla of evidence that Villani was influenced by a corrupt or improper motive. The Galantes were florists, with an established business in Newark, and, on at least one prior occasion, had been granted the privilege of vending flowers on municipal property for a limited period, although the terms imposed do not appear. It seems clear, however, that if they knew of the existence of the itinerant vendors' ordinance, they did not regard it as applicable, and considered that a reasonable rental fee would suffice. And it can hardly be said that a denial of its applicability, under the circumstances here presented, constituted *mala fides*. This was the case of a resident florist seeking permission to transact business in an unused public place for a five days' period, which in all likelihood would not yield a return sufficient to pay the fee required by the itinerant vendors' ordinance.

There was, therefore, no evidence of prosecutor's guilt of this charge, except such as is clearly hearsay. This is conceded by defendants' counsel, who urge the admissibility of such evidence and its sufficiency to support the judgment. But this would do violence, not only to an established rule of evidence, but to fundamental concepts of justice. The rule is that the admission of illegal testimony in cases such as this will not invalidate the judgment, if there is *competent* evidence to support it. *Crane* v. *Jersey City,* 90 *N. J. L.* 109. Compare *Helminsky* v. *Ford Motor Co.,* 111 *Id.* 369.

*Re Manna and Rutigliano:* The charge here was that prosecutor, in disregard of the duty imposed by the Motor Vehicle act, released the defendants from imprisonment under a suspension of sentence, and made a false report to the motor vehicle commissioner. He was not convicted of the latter charge, nor was there any evidence tending to support it. The report was concededly made by the clerk of the court, without Villani's knowledge. He was found guilty of "having acted contrary to the statute, and of having attempted to induce the defendants to retain his office associate, Acocella, as counsel." But this latter accusation was not incorporated in the charge in any form. Nor does the evidence sustain it. While a witness testified that Villani suggested that Acocella be retained, there was overwhelming evidence to the contrary. The inference of misconduct sought to be drawn from this alleged circumstance is that the suspension of sentence would be granted only in the event that a retainer were paid to Acocella. Yet it appears that, while Acocella was not retained (the defendants were represented by two members of the bar who, concededly, were not associated, directly or indirectly, with Villani or Acocella), the defendants were released. And there is no proof that a fee was paid to Acocella. The undisputed evidence is to the contrary. One of the defendants' counsel, Mr. Benjamin Eber, testified that he presented the application for a suspension of sentence, and prosecutor testified that he was moved to grant it for the reasons advanced by counsel, viz., family considerations, the nearness of the Christmas holiday season, and the belief that the loss of their motor vehicle licenses would serve the ends of justice. Villani insisted that he was not in doubt as to his power in the premises. He read a communication from the motor vehicle commissioner, in another case, as such a departmental interpretation of the act, and there was evidence that, on a prior occasion, the presiding judge of another court of criminal jurisdiction, established in Newark, had so interpreted the act, and had exercised such power.

The evidence affords no basis for the conclusion of a corrupt or improper motive. Here, again, defendants admit the

weakness of their case by resorting to hearsay testimony, *i. e.,* statements claimed to have been made by witnesses to police officers, at variance with their evidence in this proceeding.

An inference of misconduct cannot be drawn from an erroneous judgment, without more. A mere error in a matter of law, or an erroneous assumption of judicial power, not influenced by a corrupt motive or other improper consideration, does not constitute ground for the removal of a judicial officer. Such a doctrine would do violence to sound public policy. It would set at naught a principle, deeply rooted in the common law, on which rests the independence of the administration of justice. It is essential to the due administration of justice that a judicial officer be free to form his own judgments. He *must* act according to his judgment. In the performance of his judicial duties, his conscience and knowledge of the law alone must control. Though he acts erroneously, he acts judicially, and if the judgment be the product of a corrupt motive or other improper consideration, he may be removed, but if merely erroneous, it may be reversed. If a contrary policy prevailed the independence of our courts would necessarily be subdued, and their authority destroyed. Men of honor and independence would not assume judicial office, if removal as for cause were the penalty for a mere error of judgment. Strict adherence to this salutary principle is essential if the judgments of our courts are to have the veneration and respect necessary for the vigorous execution of our laws. Compare *In re New Jersey State Bar Association,* 114 *N. J. Eq.* 261, 265; *Grove* v. *Van Duyn,* 44 *N. J. L.* 654; *Yates* v. *Lansing,* 5 *Johnson C. L. R.* 282. To justify removal for cause, the conduct complained of must, therefore, be the product of a corrupt or other improper motive, or the judicial officer's general unfitness must clearly appear.

*Re Colton:* The gist of this charge is that prosecutor advised Mrs. Colton that, to effect the release of her son, she would have to retain his office associate, Acocella, and pay him $50.

We find no evidence to support this accusation. Mrs. Colton testified that when she found her son was under arrest,

she consulted a relative of prosecutor. At his suggestion, she called upon Villani, who told her that the complaint had been referred to the grand jury, and was "out of his hands," and he "could do nothing for her." The following day she consulted an assistant prosecutor of the pleas of the county of Essex, who advised her to make application to Judge Villani for a reduction in the bail. She did so. Villani said he could "do nothing for me outside of reducing the bail from $5,000 to $1,000." She replied that she "did not have $1,000, and he said it would cost me $50." She later amplified this statement thus: Villani stated that "if he reduced the bail to $1,000 it would probably cost you $50 to get a bond." She volunteered the statement that Villani mentioned the "National Bonding Company." She emphatically denied that he suggested she retain Acocella, or pay him the sum of $50. It seems to be conceded that no money was paid to Villani or Acocella. Yet Villani advised the assistant prosecutor, by letter dated December 11th, 1933, that Colton's mother had "interceded for him through a relative of mine," and "I would respectfully submit that if it is possible (*sic*) reduce the bail to $1,000, so that his mother can make arrangements to have him out for the holidays." In this case, also, defendants invoke evidence that is concededly hearsay to support the judgment. It follows that there was was no evidence tending to support this charge.

The director of public safety did not base his judgment in either case upon competent evidence. He made the observation, in the light of which the conviction stands out as a most extraordinary pronouncement, that "there was perjury committed in all cases, and we will attend to that later too." If the director thereby meant to imply that he rested his findings of guilt upon evidence perjuriously withheld by false witnesses (and our examination of the testimony satisfies us that such is the implication intended), the findings cannnot stand. That being so, there is no basis for the judgment.

These charges reflect gravely upon the honor and integrity of prosecutor. He is a member of the bar, and his professional honor, as well as his capacity and fitness for public

office, is assailed. His standing, professional and otherwise, depends upon the maintenance of public confidence—the preservation of the good name and fame that springs from and is sustained by the belief, commonly accepted, that he is one who adheres, in the professional as well as public relations, to the standards of honor and right conduct. The obligation resting upon the courts of justice to vindicate and enforce the right of property, and to safeguard it against encroachment, is conceded to be primary and pre-eminent, but the right to keep one's self unspotted before the world is no less sacred. One should not be deprived of this priceless heritage on mere suspicion of dishonorable conduct, or on evidence that derives its efficacy, not from the personal knowledge of the witness, but from hearsay and mere rumor. The salutary rule that testimony, to meet the standard of credible evidence, shall emanate from and be based upon the knowledge of the witness, is one that the courts must rigidly adhere to and enforce under all circumstances. No right, either of person or of property, is safe otherwise. Guilt must be established by a fair preponderance of the evidence. The proofs should make such state demonstrably clear. They should be sufficient to overcome the opposing presumptions, as well as the opposing evidence.

The conviction of prosecutor, and the consequent judgment of ouster, will be set aside, with costs.