684 A.2d 930

EXECUTIVE COMMISSION ON ETHICAL STANDARDS, PETITIONER–RESPONDENT, v. EDWARD H. SALMON, RESPONDENT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued October 21, 1996—Decided November 13, 1996.

Before Judges PETRELLA, LANDAU and KIMMELMAN.

*Edward N. Fitzpatrick* argued the cause for appellant (*DeCotiis, Fitzpatrick & Gluck,* attorneys; *Mr. Fitzpatrick,* of counsel; *Joseph M. DeCotiis,* on the brief).

*Sharon M. Hallanan,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General, attorney; *Mary C. Jacobson,* Assistant Attorney General, of counsel; *Ms. Hallanan,* on the brief).

PER CURIAM.

Appellant Edward H. Salmon (Salmon), a commissioner of the Board of Public Utilities (BPU), appeals from a final order of respondent Executive Commission on Ethical Standards (ECES). The final order entered July 25, 1996, found that Salmon had committed six violations of the Conflicts of Interest Law, *N.J.S.A.* 52:13D–12 to –27, and the BPU Code of Ethics which was promulgated pursuant to *N.J.S.A.* 52:13D–23. The ECES imposed a $3000 penalty ($500 for each of the six violations) and finding, under *N.J.S.A.* 52:13D–21(i), that Salmon's conduct constituted a willful and continuous disregard of the provisions of the Conflicts of Interest Law and the BPU Code of Ethics, ordered Salmon removed from public office and barred for five years from holding public office in any capacity. Pending appeal, Salmon's removal from office was stayed by the Supreme Court and the hearing of this matter was ordered to be accelerated.

I

On May 17, 1995, the ECES filed an eight-count complaint (later amended) against Salmon charging:

Count one: That on November 17, 1991, at a conference of the National Association of Regulatory Utility Commissioners (NARUC), held in San Antonio, Salmon attended a dinner paid for by an attorney whose law firm represented an electric utility regulated by the BPU;

Count two: That on November 15, 1992, at a NARUC conference held in Los Angeles, Salmon attended a dinner paid for by the same attorney whose law firm represented the same electric utility;

Count three: That on May 6, 1992, Salmon attended the annual New Jersey Legislative Correspondents Club dinner and his ticket to the dinner was paid for by the same attorney whose law firm represented the same electric utility;

Count four: That in February 1992, at a NARUC winter conference meeting held in Washington, D.C., Salmon attended a dinner party paid for by a vice-president of an electric utility regulated by the BPU;

Count five: That in February 1993, at a NARUC winter conference meeting held in Washington, D.C., Salmon attended a dinner paid for by a vice-president of the same electric utility;

Count six: That the same vice-president of the same regulated electric utility helped Salmon, in July 1993, in his successful campaign to be a second vice-president of NARUC, which position ultimately led to Salmon's elevation to president of NARUC in the fall of 1995;

Count seven: That Salmon organized recreational basketball games to be played at NARUC conferences held in July of 1992, 1993, and 1994 and that a utility regulated by the BPU made donations to local YMCAs or payments to athletic clubs, in order for basketball courts to be made available for NARUC games organized by Salmon;

Count eight: That the nature of the conduct alleged in each of the preceding counts constitutes a willful and continuous disregard of the Conflicts of Interest Law and the BPU Code of Ethics.

The ECES' complaint demanded judgment that Salmon be fined in the amount of $500 for each of the foregoing violations, that he be removed as a Commissioner of the BPU, and that he be barred from holding any public office or employment in New Jersey for a period of five years.

Upon Salmon's filing of a contesting answer, the matter was transmitted to the Office of Administrative Law for a hearing before an Administrative Law Judge (ALJ). The initial decision by the ALJ concluded that Salmon was guilty only of counts one, two, and three, that is, accepting two dinners at NARUC conferences and accepting a free ticket for attendance at the Legislative Correspondents Club dinner. A fine of $500 for each of the counts, totalling $1500 was recommended. The ECES adopted the ALJ's initial decision on counts one, two, and three and imposed the recommended maximum fine for each of the counts.

With respect to counts four and five, the ALJ accepted testimony by Salmon and his assistant that they had requested that the BPU be billed for the 1992 and 1993 dinners in accordance with established BPU practice. The ALJ found that although Salmon did not follow up to determine whether the regulated electric utility had billed the BPU or whether the BPU had paid the same, Salmon had alerted the BPU's travel coordinator to be on the lookout for the bills and to process the same when received. The ALJ determined that Salmon was not guilty of counts four and five because he found that Salmon believed that the electric utility had complied with the instructions to bill the BPU. He also found that it was difficult to determine compliance because the BPU's travel and reimbursement records were kept in a "chaotic" fashion, that more likely than not "no actual request for reimbursement was ever submitted[,]" and he concluded that Salmon's failure to follow up was not an ethics violation.

The ECES accepted the ALJ's findings of facts relative to counts four and five but decided from those findings that Salmon was also guilty of those counts. The ECES imposed the maximum fine of $500 for each count.

We do not discuss count six since the ECES adopted the ALJ's finding of no ethics violation and neither party disputes this ruling.

The ALJ reasoned that Salmon was not guilty, under count seven, of accepting gifts by reason of permitting a regulated utility to pay for the use of local basketball courts at NARUC conven-

tions. He held that there was no evidence that Salmon was aware that a regulated utility had paid for the use of such local facilities. Here again, the ECES accepted the ALJ's factual findings but drew a different conclusion and found Salmon guilty of count seven.

Finally, the ALJ rejected count eight, concluding that the ethics violations found in counts one through three did not rise to the level of a willful and continuous disregard of the ethics laws by Salmon. The ALJ stated that there was "[n]othing about Salmon's conduct [which] suggest[ed] any element of venality" and that Salmon "did not purposely and knowingly flaunt and ignore standards which were known to him." Finding no evidence that Salmon ever compromised the integrity of his office, the ALJ rejected the complaint's demand that Salmon be removed from office, terming Salmon to have been an "honest and effective public official." The ECES did not adopt the ALJ's recommended rejection and found Salmon guilty of a "willful and continuous disregard" of the ethics laws as charged in count eight.

## II

The procedural underpinning of this case makes for a particularly complex standard of review. The evidence was heard by an ALJ who found facts and made recommendations. The ECES then considered those recommendations, agreed with some, rejected others, made some of its own findings, and issued its conclusions memorialized in the final order under appeal.

Not to be overlooked in this case are the many roles performed by the ECES in this type of matter. It acted as investigator, prosecutor, sworn witness, and judge. This court has cautioned "that when the prosecutorial and adjudicative functions are concentrated in the same body and exercised in a quasi-judicial setting there is danger that resultant dispositions may be arbitrary...." *In re Suspension of License of Silberman,* 169 *N.J.Super.* 243, 255, 404 *A.*2d 1164 (App.Div.1979); *See* 2 *Am. Jur.2d Administrative Law,* §§ 70, 302 (1994). We examine an

agency's findings to determine whether they are supported by substantial credible evidence, *Dennery v. Bd. of Educ.,* 131 *N.J.* 626, 641, 622 *A.*2d 858 (1993), and will affirm if so supported, but we are not bound to do so if the ECES' finding is arbitrary and capricious or wide of the mark. *Silberman, supra,* 169 *N.J.Super.* at 255–56, 404 *A.*2d 1164; *Formosa v. Equitable Life Assurance Society,* 166 *N.J.Super.* 8, 20, 398 *A.*2d 1301 (App.Div.) (citing *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964)), *certif. denied,* 81 *N.J.* 53, 404 *A.*2d 1153 (1979). This court "[o]rdinarily . . . will not reverse the determination of an administrative agency unless it is arbitrary, capricious, or unreasonable . . . ." *Dennery, supra,* 131 *N.J.* at 641, 622 *A.*2d 858; *see also Impey v. Bd. of Educ.,* 142 *N.J.* 388, 397, 662 *A.*2d 960 (1995); *L.M. v. State Div. of Med. Assistance and Health Servs.,* 140 *N.J.* 480, 489–90, 659 *A.*2d 450 (1995). We defer to the expertise of the State agency "where such expertise is a pertinent factor." *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965).

▪ In sum, these standards of judicial review requiring an alertness to agency conclusions which might be "arbitrary and capricious" and a watchful eye to determine that an agency's findings are "substantially supported by the record" create a high threshold for judicial review. However, the particular circumstance presented here, where the ECES has performed the roles of prosecutor, investigator, sworn witness, and judge, must heighten the sensitivity with which we weigh the findings and conclusions made below against the evidence entered into the record.

▪ We note the "ancient principle of Anglo–American justice that 'no man shall be a judge in his own cause' " referred to in *Pyatt v. Mayor and Council of Dunellen,* 9 *N.J.* 548, 555–56, 89 *A.*2d 1 (1952) (citing *Bonham's Case,* 8 *Co.,* 113 *b,* 118 *a,* 77 *Eng. Rep.* 646, 652 (K.B.1610)). However, in the review of state administrative agency cases, the accepted practice is contrary to that ancient principle. The general law on the subject is expressed at 2 *Am.Jur. Administrative Law,* § 70 (1994).

> It is, in fact, typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure ... does not violate due process of law.
>
> The danger of unfairness is particularly great in an agency in which there is a high degree of concentration of both prosecuting and judicial functions, especially where the functions are combined in the same persons. The courts have pointed out that in such situations the agency members must be zealous in the recognition and preservation of the right to a hearing by impartial triers of the facts, and such fusion of functions has been subjected to considerable criticism.
>
> [*Ibid.* (citations omitted).]

With these precepts in mind, we now undertake our review of the contested issues in this case.

### III

On appeal, Salmon does not contest the findings and recommendations of the ALJ, adopted by the ECES, that ethics transgressions inhered in counts one, two, and three involving the November 17, 1991, dinner at a NARUC convention in San Antonio, the November 15, 1992, dinner at a NARUC convention in Los Angeles, and the ticket to the Legislative Correspondents Club dinner held May 6, 1992, all paid for by the attorney whose law firm represented a regulated electric utility. Salmon, however, does contest the characterization by the ECES that the ethics transgressions under counts one, two, and three evidence a willful and continuous disregard of ethics standards.

The Legislature has set forth the boundaries for ethical behavior in the Executive Branch in *N.J.S.A.* 52:13D–14, *N.J.S.A.* 52:13D–23(e)(6), *N.J.S.A.* 52:13D–23(e)(7), and *N.J.S.A.* 52:13D–24, which generally prohibit a State officer or employee from soliciting or accepting gifts which he knows or has reason to believe are offered to him with the intent to influence him in the performance or discharge of his official duties or which might reasonably be expected to create an impression or suspicion among the public having knowledge of his acts that he may be engaged in conduct violative of his public trust. Pursuant to *N.J.S.A.* 52:13D–23(b), the BPU has enacted a code of ethics to guide its own personnel. Sections 2(d) and 2(e) of the BPU Code of Ethics generally

incorporate the language of *N.J.S.A.* 52:13D–23(e)(7) (upholding the public trust). Section 6 of the BPU Code incorporates the language of *N.J.S.A.* 52:13D–14, *N.J.S.A.* 52:13D–23(e)(6), and *N.J.S.A.* 52:13D–24, and further provides:

> Except as noted elsewhere in this Code, employees are responsible for full payment for the costs of their meals, beverages, lodging and entertainment and may not accept the same from any person, partnership or corporation doing business with the Board, contemplating such business, or seeking to influence official actions. Reimbursement by the Board for expenses is limited to those allowed by and in amounts permitted by the President of the Board.

> (a) The acceptance of any gifts, preferential loans, services at preferential rates, discounts, gratuities or anything of monetary value from a person or organization doing business with the Board or the granting of special treatment or favors to such persons or organizations for the purpose of obtaining personal gain, is a conflict of interest. Under this section, the term "persons" includes employees or agents or organizations doing business with or contemplating doing business with the Board.

>     \*     \*     \*     \*     \*     \*     \*     \*

> (b) Example [sic] of gifts include cash, liquor, personal or household goods, use of cars, lodging and other favored treatment. This section also includes a specific prohibition . . . against the acceptance of beverages or entertainment from persons, utilities or law firms representing utilities, doing business with the Board or contemplating doing business with it. This includes Christmas parties, open houses and other social functions given by persons, utilities or law firms doing business with the Board.

Salmon contends that the ECES' determination of a violation on each of counts four, five, and seven and the conclusion of "willful and continuous disregard" of ethics standards with respect to count eight are arbitrary, capricious, and not supported by substantial credible evidence in the record. As noted above, the ECES adopted the facts found by the ALJ with respect to counts four and five but drew a different conclusion therefrom. These counts charged that at both the 1992 and 1993 NARUC winter conference meetings held in Washington, D.C., Salmon attended a dinner party hosted and paid for by a vice-president of a regulated electric utility.

The facts found by the ALJ and adopted by the ECES were that on the occasion of each dinner officials of the regulated electric utility were instructed, by Salmon at the first dinner and

by Salmon's executive assistant at the second dinner, to submit a
bill to the BPU; that the BPU's travel coordinator was advised by
Salmon that when the request for reimbursement arrived, she
should "take care of it"; that this instruction to bill the BPU was
in accordance with a longstanding and accepted BPU practice; but
that Salmon never specifically checked thereafter to determine if
billings had been submitted and paid. The ALJ recommended
that Salmon's failure to follow-up on whether the regulated utility
had been reimbursed for the Washington dinners did not consti-
tute a basis for finding that he had violated any ethics prohibi-
tions. The ECES disagreed. Notwithstanding that Salmon testi-
fied that it was not his responsibility to follow-up, the ECES held
that Salmon should have taken personal responsibility for comply-
ing with prohibitions imposed by the Conflicts of Interest Law and
the BPU Code of Ethics against accepting free meals.

In our view, the ECES' findings of ethics violations under
counts four and five are not plainly unreasonable. *L.M. v. State
Div. of Medical Assistance and Health Servs.*, 140 *N.J.* 480, 489–
90, 659 *A.*2d 450 (1995). The failure of Salmon to follow-up on the
billing and payment for the dinners was found by the ECES to
have created the appearance of impropriety. That judgment was
based upon facts reasonably supportable in the record and we will
defer to the expertise of the State agency. *In re Advisory
Committee on Professional Ethics Opinions 621*, 128 *N.J.* 577,
603, 608 *A.*2d 880 (1992); *Merin v. Maglaki*, 126 *N.J.* 430, 437, 599
*A.*2d 1256 (1992); *Matter of Warren*, 117 *N.J.* 295, 296–97, 566
*A.*2d 534 (1989); *Close v. Kordulak Bros.*, 44 *N.J.* 589, 599, 210
*A.*2d 753 (1965).

## IV

Count seven of the amended complaint charged Salmon
with committing an ethics violation where a representative of a
regulated utility made donations to local YMCAs or payments to
local athletic clubs for the purpose of securing the availability of
their basketball courts for use by all of the commissioners of

various jurisdictions for recreational activity during the 1992, 1993, and 1994 conventions of NARUC. Salmon, who has a keen interest in basketball, was continuing a program that predated his service in NARUC. He organized these "pick-up" basketball games along with a representative of a New Jersey regulated utility. The utility-representative arranged for sites for the games at each meeting venue. Commissioners from the various NARUC jurisdictions, along with Salmon, were players. Each player personally paid a fee for a locker and towel service at each location. The ALJ found as a fact that Salmon did not know and had no reason to know that, beyond the individual fees paid by the playing commissioners, the regulated utility through its representative had been making donations or paying[1] for the use of the basketball courts. Consequently, the recommendation was that Salmon be found not guilty on count seven. Again, the ECES did not take issue with the foregoing facts found by the ALJ. It determined, however, that "Salmon's acceptance of the free basketball court use and his acceptance of assistance from [the representative of the regulated utility] in organizing the games were improper...." The ECES concluded "that Salmon violated [the Conflicts of Interest Law and] the BPU Code of Ethics in accepting the use of the basketball courts, acceptance of assistance of [the representative of the regulated utility] in arranging for the games ... and by perpetuating a close personal relationship with a member of the regulated community." The ECES perceived that the "perpetuation of a close personal relationship with a member of the regulated community constitutes conduct that might reasonably be expected to create an impression or suspicion of a violation of the public trust in contravention of Sections 2(d) and 2(e) of the BPU Code."

Section 2(d) of the BPU Code of Ethics, which incorporates *N.J.S.A.* 52:13D–23(e)(7), prohibits a State officer from "knowingly act[ing] in any way that might reasonably be expected to create an

---

[1] The donations and payments totalled approximately $3200 over the three-year period.

impression or suspicion among the public having knowledge of his acts that he may be engaged in conduct violative of his trust. . . ." Section 2(e) prohibits "conduct . . . which creates a justifiable impression among the public that such trust is being violated."

The "perpetuation of a close personal relationship" was the wrongful action or conduct perceived by the ECES which might reasonably be expected to create a justifiable impression or suspicion that Salmon may be engaged in conduct violative of his public trust. Salmon was found by the ALJ to be unaware that donations had been made to the "Y's" and payments had been made to the athletic clubs for the use of their gyms. We have difficulty in accepting the ECES' conclusion that the mere allowance by Salmon of a utility representative to assist in arranging for the use of the basketball courts created a justifiable impression or suspicion of a breach of public trust. There are salutary reasons for open and amicable interface opportunities between regulators and the regulated, e.g., to foster the promotion of satisfactory and efficient services for the benefit of the public. What must be guarded against are the development of associations so close as to threaten, or appear to threaten, objective regulation in the public interest, or which violate express ethics mandates. We find unreasonable the ECES' conclusion of a breach of the Conflict of Interests Law and the BPU Code of Ethics in this regard.

Similarly, we do not agree that the record fairly sustains a finding that use of the basketball courts at the NARUC meetings constituted gifts made personally to Salmon. If anything, the availability of the basketball courts benefitted the members of NARUC and not Salmon in particular. After an extensive examination of the record, we are satisfied that the ALJ's factual findings that Salmon had no knowledge of the donations and payments for the use of basketball courts was based upon substantial credible evidence in the record considering the proofs as a whole and may not be ignored. *See In re Suspension of License of Silberman,* 169 *N.J.Super.* 243, 255–56, 404 *A.*2d 1164 (App.Div. 1979), *aff'd,* 84 *N.J.* 303, 418 *A.*2d 266 (1980). The ECES' finding

to the contrary, that a gift was made, was arbitrary and unreasonable. *Dennery v. Board of Educ.*, 131 *N.J.* 626, 641, 622 *A.*2d 858 (1993); *Board of Educ. of Elizabeth v. City Council of Elizabeth*, 55 *N.J.* 501, 507, 262 *A.*2d 881 (1970); *See Jennings v. Cutler*, 288 *N.J.Super.* 553, 562, 672 *A.*2d 1215 (App.Div.1996) (citing *In re Dodge*, 50 *N.J.* 192, 216, 234 *A.*2d 65 (1967), and holding that the elements of an inter vivos gift are the donor's donative intent, actual or symbolic delivery, and absolute and irrevocable surrender). If, in fact, a gift was intended to be made, the putative donee lacked the knowledge requisite under *N.J.S.A.* 52:13D–14 and BPU Code section 6. In these sections, knowledge of the gift is specifically required in view of the provision that "[n]o state officer ... shall accept ... any gift ... which he knows or has reason to believe is offered to him with intent to influence him in the performance of his public duties and responsibilities." *See also N.J.S.A.* 52:13D–23(e)(8). The State officer must be aware of the gift so that he can make the judgment call as to whether it has been offered with the intent to influence him in the performance of his duties.

Even if we indulged in the presumption that a gift was made, and we do not, the utility's contributions to the gym operators must be deemed spread over a three-year span and apportioned among all those utility commissioners from the fifty states and Canada who played basketball at the conventions. It is unreasonable to characterize such a *de minimis* benefit to Salmon as a "gift ... or ... thing of value ... offered ... to influence him in the performance of his public duties and responsibilities." *See N.J.S.A.* 52:13D–14, –23(e)(8); BPU Code of Ethics § 6.

We reverse the ECES' determination of an ethics violation with respect to count seven of the amended complaint.

## V

Finally, we address count eight of the amended complaint which charges Salmon with a "willful and continuous disregard" of his ethical obligations as a State officer. The ECES rejected the

ALJ's recommendation that there was no basis in the factual findings for a determination that Salmon was guilty of a willful and continuous "pattern of violations which bespeak some callous and knowing disregard of the ethical obligations...." We note that the ALJ's conclusion of non-willfulness was based upon his recommendation of guilt with respect to the charges in counts one, two, and three of the amended complaint. The ECES' conclusion of a "willful and continuous disregard" was based upon its finding of guilt with respect to counts one, two, three, four, five, and seven. Having reversed the ECES on count seven, our determination will be confined to whether counts one through five reasonably may be deemed to support the conclusion of "willful and continuous disregard" of the Conflicts of Interest Law and the BPU Code of Ethics.

### A

*N.J.S.A.* 52:13D–21(i) provides:

Any State officer or employee ... found guilty by the commission of violating any provision of this act or of a code of ethics promulgated pursuant to the provisions of this act *shall* be fined not less than $100.00 nor more than $500.00 ... and *may* be suspended from his office or employment by order of the commission for a period of not in excess of 1 year. If the commission finds that the conduct of such officer or employee constitutes a willful and continuous disregard of the provisions of this act or of a code of ethics promulgated pursuant to the provisions of this act, it *may* order such person removed from his office or employment and *may* further bar such person from holding any public office or employment in this State in any capacity whatsoever for a period of not exceeding 5 years from the date on which he was found guilty by the commission.

[ (emphasis added).]

In the absence of a definition of the term "willful" contained in the Conflicts of Interest Law or the BPU Code of Ethics, the ECES looked to cases arising under section 255 of the Federal Fair Labor Standards Act (FLSA), 29 *U.S.C.A.* § 255(a), particularly *Coleman v. Jiffy June Farms, Inc.,* 458 *F*.2d 1139, 1142 (5th Cir.1971), *cert. denied,* 409 *U.S.* 948, 93 *S.Ct.* 292, 34 *L.Ed.*2d 219 (1972). In *Jiffy June,* an infraction of the FLSA was deemed to be willful when the employer changed employees' rates of pay with knowledge that the FLSA was applicable to its operations. The

final order of the ECES failed to recognize that the *Jiffy June* standard of willful conduct was specifically rejected by the United States Supreme Court in *McLaughlin v. Richland Shoe Co.*, 486 *U.S.* 128, 134, 108 *S.Ct.* 1677, 1682, 100 *L.Ed.*2d 115, 123 (1988), where the Court said the *Jiffy June* standard "is not supported by the plain language of the statute (FLSA), we readily reject it."

The *Jiffy June* standard was criticized by the United States Supreme Court as permitting "a finding of willfulness to be based on nothing more than negligence, or, perhaps, on a completely good faith but incorrect assumption" that the challenged conduct was lawful. *Id.* at 135, 108 *S.Ct.* at 1682, 100 *L.Ed.*2d at 124.

The meaning of "willful" was defined by the *McLaughlin* Court as follows:

> In common usage the word "willful" is considered synonymous with such words as "voluntary," "deliberate," and "intentional".... The word "willful" is widely used in the law, and although it has not by any means been given a perfectly consistent interpretation, it is generally understood to refer to conduct that is not merely negligent.
>
> [*Id.* at 133, 108 *S.Ct.* at 1681, 100 *L.Ed.*2d at 123 (citations omitted).]

This court is not bound by an agency's interpretation of a statute. *See Mayflower Securities v. Bureau of Securities,* 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973). We reject the *Jiffy June* standard as no longer persuasive.

In *Fielder v. Stonack,* 141 *N.J.* 101, 125, 661 *A.*2d 231 (1995), the New Jersey Supreme Court dealt with the meaning of the phrase "willful misconduct" in the context of a police pursuit. The police officer who collided with an innocent motorist could not be exonerated under the applicable statute if his conduct constituted "willful misconduct." In holding that willful misconduct in the context of a police pursuit means "the knowing failure [of a police officer] to follow specific orders[,]" *id.* at 126, 661 *A.*2d 231, the Court noted that the phrase "willful misconduct" is not immutably fixed but takes its meaning from the context and purpose of its use. *Id.* at 125, 661 *A.*2d 231. The Court further said:

> Although willful misconduct need not involve the actual intent to cause harm ... there must be some knowledge that the act is wrongful.... 'Willful misconduct' is

the commission of a forbidden act with actual (not imputed) knowledge that the act is forbidden.

[*Fielder, supra,* 141 *N.J.* at 124, 661 *A.*2d 231.]

Although the *Fielder* court formulated its "willful" standard expressly for police-chase scenarios, we find its reasoning to be pertinent in the context of ethics violations. Both scenarios deal with possible malfeasance of a person charged with protection of the public. Cases in the criminal context define the word "willful" as signifying an intentional execution of an unlawful plan which has been conceived and deliberated upon. *See, e.g., State v. DiPaolo,* 34 *N.J.* 279, 295, 168 *A.*2d 401 (1961), *cert. denied,* 368 *U.S.* 880, 82 *S.Ct.* 130, 7 *L.Ed.*2d 80 (1961).

Interpretation of *N.J.S.A.* 52:13D–21(i) must center upon its structure and plain language. *Kimmelman v. Henkels & McCoy, Inc.,* 108 *N.J.* 123, 128, 527 *A.*2d 1368 (1987). Our consideration is guided by *N.J.S.A.* 1:1–1 which provides:

In the construction of the laws and statutes of this state ... words and phrases shall be read and construed with their context, and shall ... be given their generally accepted meaning, according to the approved usage of the language. Technical words and phrases, and words and phrases having a special or accepted meaning in the law, shall be construed in accordance with such technical or special and accepted meaning.

The evident purpose of *N.J.S.A.* 52:13D–21(i) is to delineate the penalties for those found guilty of violating any provision of the Conflicts of Interest Law or Codes of Ethics promulgated pursuant to such Law. Two levels of penalties are established depending upon the degree of culpability of the ethics offender. The initial or lower level, in addition to fines, permits an offender to "be suspended from his office or employment for a period not in excess of 1 year." The second or more severe level permits an offender to be removed from his office or employment and barred from holding any public office or employment for a period not exceeding five years after crossing a threshold finding that the conduct of the offender constitutes a "willful and continuous disregard" of the ethics laws.

Thus, the structure and plain language of *N.J.S.A.* 52:13D–21(i) contemplate that a distinction be made with respect to the degree

of culpability of the ethics offender. By reserving the more severe level of punishment for offenders whose conduct constitutes a "willful and continuous disregard" of the ethics laws, the Legislature intended to and did draw a distinction between those offenders whose conduct was merely negligent, heedless, or unintentional even though the offender was aware of the ethics laws. By drawing such distinction, it is clear that the Legislature intended to reject a finding of willfulness for conduct that was merely negligent, heedless, or unintentional. Consequently, the *Jiffy June* standard, which permits a finding of willfulness based upon nothing more than negligence or, perhaps, upon a completely good faith but incorrect assumption, was not within the contemplation of the Legislature as expressed by the plain language of the statute.

The legislative use of the words "continuous disregard" in conjunction with the word "willful" conveys the intention that something more than mere negligence, inattention, or heedlessness is required for conduct to constitute a "willful and continuous disregard" of the ethics laws. Accordingly, we determine that conduct, to be considered willful under *N.J.S.A.* 52:13D–21(i), must be intentional and deliberate, with knowledge of its wrongfulness, and not merely negligent, heedless, or unintentional.

B

Additionally, under the statute, the offending conduct must be something more than just willful. It must also be continuous. The Supreme Court has defined "continuing" as "pervasive or chronic" in *Uricoli v. Police & Firemen's Retirement System,* 91 *N.J.* 62, 78–79, 449 *A.*2d 1267 (1982). We find this definition analogous to the word "continuous" as it is used in section 21(i). Therefore, the willful conduct must involve more than a few isolated acts. We hold that the phrase "willful and continuous disregard" conveys a legislative intent that the offending conduct involve not only a pervasive and chronic disregard of the ethics laws but that the conduct must be: (1) intentional with knowledge

of its wrongfulness, (2) deliberate, (3) conceived, and (4) not merely negligent, heedless, or unintentional.

## C

By establishing two levels of penalties in *N.J.S.A.* 52:13D–21(i), the Legislature required the offender's conduct to evidence something more than negligence, heedlessness, carelessness, a lapse of attention, or a lack of vigilance in order to justify a finding of "willful and continuous disregard" of mandates of the ethics laws. Mere knowledge of the applicable ethics standards, formerly adequate under the now discredited *Jiffy June* standard, will not suffice to sustain a "willful and continuous disregard" finding under *N.J.S.A.* 52:13D–21(i). The conduct must be intentional with knowledge of its wrongfulness, deliberate, conceived, not merely negligent, and pervasive and chronic in order to conform to the legislative use of the words "willful and continuous disregard." Short of an offender's conduct rising to that level, the plain legislative intent was that the lesser level of sanctions authorized in *N.J.S.A.* 52:13D–21(i) would suffice.

## VI

We are satisfied that Salmon did have a working, if not detailed, knowledge of and familiarity with the Conflicts of Interest Law and the BPU Code of Ethics. The ALJ found as much and his finding was adequately supported by the record.

Salmon's general knowledge of the less subjective requirements of the ethics laws is well evidenced by his conduct with respect to the two dinners at the winter NARUC conferences in Washington, D.C. held in February 1992, and February 1993. On each occasion, the representative of the regulated utility was instructed and advised to submit a bill to the BPU for the cost of the dinner. Salmon then alerted the appropriate BPU employee to be on the lookout for the bills and to pay the same. Salmon's failure to follow-up was deemed an ethics violation by the ECES but his admitted failure to follow-up can be regarded as nothing more

than carelessness or inattentiveness on Salmon's part due to the press of other business. The record does not support any inference that his failure to follow-up was intentional and when coupled with his instruction that the utility submit a bill to the BPU, his conduct did not exhibit a willful disregard of the ethics standards. By reason thereof, the violations of counts four and five found by the ECES cannot rise to the level of "willful and continuous disregard" whether considered alone or in conjunction with violations of other counts of the amended complaint.

Consequently, violations of counts four and five may be penalized only at the lesser level specified by the Legislature.

## VII

The violations of counts four and five may not be used or weighed to raise the violations of counts one, two, and three up to the threshold level of "willful and continuous disregard" of the ethics standards. Factually, the ECES' conclusion of violations with respect to counts four and five was based upon Salmon's failure to follow-up on whether the regulated electric utility had submitted bills for reimbursement for the cost of the two free dinners. It is not disputed that Salmon and his assistant advised the utility to charge for the dinners. That action clearly underscores that there was no willfulness in Salmon's mind. He wanted the BPU to be billed and had no intention of being the recipient of a free dinner. At most, he was negligent in not following-up and, consequently, counts four and five may not be further used to enhance the level of punishment.

We, therefore, confine our consideration to the violations of counts one, two, and three relating to Salmon's presence at the November 17, 1991, dinner at a NARUC conference held in San Antonio, at the November 15, 1992, dinner at a NARUC conference held in Los Angeles, and at the May 6, 1992, New Jersey Legislative Correspondents Club dinner. On each occasion, Salmon's dinner was paid for by an attorney whose law firm represented a regulated utility. The issue is whether those three dinners

within a twelve-month span exhibit a pervasive and chronic pattern on Salmon's part to continuously disregard ethics standards. In our view, they do not.

The ALJ found each dinner to be the result of a lapse of ethical sensibility and concluded, however, that these violations were not knowing and intentional. Nevertheless, the ECES, determined that Salmon's conduct in accepting these dinners was a "willful and continuous disregard" of ethics standards. It highlighted in its findings what it termed "prolific" correspondence and notes between Salmon and the representatives of the regulated utilities concerning the basketball games and the NARUC dinners held in Washington, D.C., which were the subject matter of counts seven, four and five, respectively.

We have reversed the ECES' finding of guilt on count seven and removed Salmon's conduct under counts four and five from being categorized as a "willful and continuous disregard" of the ethics standards. Accordingly, to the extent facts supporting those counts were deemed necessary by the ECES to strengthen its determination of "willful and continuous disregard," those findings must be rejected.

We must consider, then, whether Salmon's conduct with respect to the violations of counts one, two, and three was sufficient to constitute "willful and continuous disregard" of ethics standards. There were three dinners over the course of twelve months hosted by a lawyer, whose friendship long preceded Salmon's status as a BPU Commissioner. Such dinners were immediately discontinued when Salmon realized they were improper. Salmon arranged for changes in the procedures at the BPU regarding disclosure and reimbursement for meals paid for by regulated utilities. We do not consider Salmon's acceptance of these three dinners as a "willful and continuous disregard" of ethics standards as we have defined that phrase. *See supra* part V B.

We are convinced from our review of the record that the conclusion and finding of "willful and continuous" conduct by the ECES was arbitrary and capricious, not supported by the record,

and must be set aside. *See Dennery v. Bd. of Educ.*, 131 *N.J.* 626, 641, 622 *A.*2d 858 (1993); *Mayflower Securities v. Bureau of Securities, supra,* 64 *N.J.* at 93, 312 *A.*2d 497; *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965); *Krupp v. Bd. of Educ.,* 278 *N.J.Super.* 31, 38, 650 *A.*2d 366 (App.Div.1994), *certif. denied,* 140 *N.J.* 277, 658 *A.*2d 301 (1995); *In re Suspension of License of Silberman, supra,* 169 *N.J.Super.* at 255, 404 *A.*2d 1164.

Salmon's violations were against the public interest and policy, and cannot be countenanced. However, there has never been a suggestion that his actions proceeded from corrupt or improper motives. The question of when the remedy of removal from office is appropriate was ably addressed by Judge Pressler in *Golaine v. Cardinale,* 142 *N.J.Super.* 385, 397, 361 *A.*2d 593 (Law Div.1976), *aff'd o.b.,* 163 *N.J.Super.* 453, 395 *A.*2d 218 (App.Div.1978), *certif. denied,* 79 *N.J.* 497, 401 *A.*2d 252 (1979):

There are certain types of culpable official conduct which are so patently inimical to the public interest and to the public trust upon which the office is predicated that they will, *per se,* not only justify but virtually compel removal, such as, for example, criminal misconduct in office or misconduct which proceeds from a corrupt or other improper motive. *Cf. Reichenstein v. Newark,* 130 *N.J.L.* 115, 123, 31 *A.*2d 814 (Sup.Ct.1943); *Villani v. Duffy,* 114 *N.J.L.* 60, 66–68, 175 *A.* 373 (Sup.Ct.1934). Because, however, removal for cause is a remedial proceeding, that cause and the culpability upon which it is based need not necessarily involve either commission of a crime or an improper purpose. *See McCran v. Gaul, supra,* 95 *N.J.L.* at 401–402, 112 *A.* 341; *Finnegan v. Miller,* 132 *N.J.L.* 192, 194–195, 38 *A.*2d 854 (Sup.Ct.1944). Where the dereliction charged, therefore, is not of such intrinsically reprehensible character, the determination of whether a specific act or omission constitutes cause for removal requires an evaluation of the conduct in terms of its relationship to the nature of the office itself, and, in that context, an appraisal of the actual or potential impairment of the public interest which may be expected to result from the conduct in question.

Removed from the taint of willful and continuous misconduct, counts one through five were not so "culpable" and "patently inimical" to the public interest and to the public's trust of Salmon as to warrant the most severe penalty afforded by *N.J.S.A.* 52:13D–21(i); removal from public office with a five-year bar from future public service. We note that our inquiries at oral argument have confirmed that the ECES does not suggest that any or all of the conduct alleged in the several counts resulted in the public's

interest having been compromised or adversely affected in any matter before the BPU. It has never been asserted that Salmon has acted other than impartially with respect to any regulated utility.

## VIII

*R.* 2:10–5 authorizes an appellate court to exercise such original jurisdiction as is necessary to the complete determination of any matter on review. The exercise of that jurisdiction is generally reserved for emergent matters implicating the public interest. *See State v. Rose,* 173 *N.J.Super.* 478, 483, 414 *A.*2d 600 (App.Div.1980). We note that Salmon's term of office will expire only a few months from now, in March 1997. The matter implicates the public interest. Moreover, we have been directed by order of the Supreme Court, entered August 13, 1996, to process this appeal on an accelerated basis.

Accordingly, we exercise original jurisdiction to reimpose penalties in light of our findings on the substantive counts. The ECES' order directing Salmon's removal from office and barring him from holding public office or employment for the next five years is reversed for the reasons set forth above. We hereby order that Salmon be suspended for ten days for his violation of each of the counts, one through five, to run consecutively so that there will be a total suspension of fifty days. We reimpose the maximum statutory penalty of $500 for each of the five counts for a total fine of $2500.

Affirmed in part, reversed in part, and modified.